Mrs. Gladys **CANTRELL** et al., Appellants,

v.

**MARKHAM & BROWN COMPANY & ASSOCIATES** et al., Appellees.

No. 17417.

Court of Civil Appeals of Texas, Dallas.

March 20, 1970.

Rehearing Denied April 24, 1970.

David M. Kendall, Jr., Woodruff, Hill, Kendall & Smith, for appellants.

John Wm. Payne, Gardere, Porter & De-Hay, Dallas, for intervenor.

Jack Pew, Jr., Ralph E. Hartman, Dallas, for appellees.

BATEMAN, Justice.

Suing on behalf of herself and her two married daughters, the appellant Mrs. Gladys Cantrell sought damages for the death of her husband, Ira Dell Cantrell, against Markham & Brown Company & Associates and Whittle Construction Company, a joint venture, herein called the defendant. Texas Employers Insurance Association intervened to recoup death benefits paid by it under the workmen's compensation law. The trial court rendered judgment notwithstanding the verdict, that plaintiff and intervenor take nothing, and by this appeal they ask us to reverse and render.

The defendant was the prime contractor for the construction of a large dam near Livingston, Texas. The dam was to be made so that excess water could be released through twelve steel "tainter gates" approximately 34 feet tall and 42 feet wide inserted between concrete abutments. They were erected on top of a concrete "crest" which itself was some 20 feet high. The gates were fabricated and supplied by Mosher Steel Company, but erected by the defendant. Upon erection of the gates it was found that angle irons designed to hold a rubber seal in place on each side of each gate could not be used because bolt holes in the angle irons were not aligned with bolt holes in the gates. These holes were about six inches apart from the top to the bottom of each gate. Mosher Steel Company sent three employees to the site of the dam to measure the holes in the gates so that the new angle irons could be fabricated.

These men were Ira Dell Cantrell, James M. Weddel and Rufus C. Bates. They undertook to measure the holes by a metal tape measure, reaching the gates by use of the defendant's dragline or crane, operated by its employee, Forrest A. Klutts. It had a boom 80 feet long, on the outer extremity of which was attached a wooden platform 8 feet square having a wooden railing 30 inches high. It is sometimes referred to in the record as "the box." Klutts would move the crane in toward the gates, and back away from the gates, and raise and lower the platform on the end of the boom, all in response to hand signals given him by one of the men on the platform. Two of the Mosher employees would ride on the platform, one to measure the holes and the other to record the measurements, and the third employee would stand on the concrete "crest" near the bottom of the gates. The surfaces of the gates were concave, bulging

out toward the men who were measuring the holes.

This crane had been so used in measuring several gates on the afternoon of May 29, 1968, and was again used on the morning of May 30, when the holes on both sides of one gate, and those on the left side of the next gate, had been measured. Bates was standing on the concrete "crest" and Cantrell and Weddel were on the platform. It was necessary to disengage the tape measure from the top of the left side of the gate so that it could be moved over approximately 42 feet to its right side. Klutts propelled the crane in toward the gates and raised the platform but did not get it close enough to permit removal of the tape. Klutts was endeavoring to move the platform in closer to the gate when the platform suddenly and unexpectedly lurched 15 to 20 feet to the right throwing Cantrell to his death.

The jury findings, numbered to correspond with the respective special issues, were: (1) that Klutts moved the platform to the right suddenly, (2) which was negligence, and (3) a proximate cause of Cantrell's death; (4) that Klutts failed to warn Cantrell of the movement of the platform to the right, (5) which was negligence, and (6) a proximate cause of Cantrell's death; (7) that at the time and on the occasion in question Klutts was acting in the course of his employment for the defendant; (8) that Cantrell did not fail to keep a proper lookout or (10) fail to hold onto the platform, and (13) that he did not stand up while the platform was moving; (16) that prior to the occasion in question Cantrell was not warned by defendant of the likelihood that the platform would lurch and sway; (20) that the characteristics of the platform mounted on the boom and occupied by Cantrell were open and obvious to him; (21) that on the occasion in question Cantrell did not have full knowledge of the characteristics of the platform; (24) that Klutts was not a special or loaned employee of Mosher Steel Company; and (25) that the occurrence was not the result of an un-

avoidable accident. Other issues awarded substantial damages.

The several grounds of the defendant's motion for judgment *non obstante veredicto* fall into four main groups: (1) that there was no legally competent evidence to support the jury's findings of primary negligence; (2) that as a matter of law Cantrell was guilty of contributory negligence proximately causing his death; (3) that the movements and characteristics of the platform were open and obvious and that Cantrell voluntarily acted with full knowledge and appreciation of the dangers involved (*volenti non fit injuria*); and (4) that as a matter of law Klutts was a special or loaned employee of Mosher Steel Company.

### Primary Negligence of Defendant

Appellants' first two points of error complain of the judgment because there was sufficient evidence to support the jury's answers to Special Issues Nos. 1, 2, 3, 4, 5 and 6, convicting Klutts of negligence proximately causing Cantrell's death.

It appears from the undisputed evidence that the crane did not operate on wheels but on tracks like an army tank, and that on this occasion it was operating in the mud; that it had sunk down in the mud so far that the tops of the tracks were about on a level with the ground; that sometimes the tracks would slip and spin in the mud, and occasionally the track on one side would obtain traction while the other spun, causing the crane to turn suddenly to one side or the other, and that when the crane would thus move about one foot the platform would move approximately 16 feet in the same direction.

Rufus C. Bates, who was standing on the crest, testified that as the crane moved toward the gate he watched the platform until it came to a stop approximately six or eight feet short of the top; that he turned around and looked back at the crane "and it seemed like he [Klutts] was having some difficulty with his levers. He was looking at the levers, I wondered why he had

stopped because it was a little longer stop than usual * * * and I looked back around at the platform and it began to lurch in my direction * * * and then I heard someone holler 'Ho'. * * * I heard the platform bump the gate and when I turned around and looked up, he [Cantrell] was in the air." Bates also testified that the whole crane including the cab and the boom, swung to the right on the turntable. He said the boom lurched in a sudden, quick movement to the right, that he did not recall anything like that happening on the day before the accident.

James M. Weddel testified that he was riding the platform with Cantrell; that he was recording the measurements being made by Cantrell; that when the platform stopped about six or eight feet from the top Cantrell got up and stepped past him and the boom suddenly lurched about 18 feet to the right, which was unexpected, and when that happened he heard Cantrell holler, and when he looked Cantrell was already over the side; they had received no warning or any indication that this movement was about to take place.

Forrest A. Klutts testified by deposition that the tracks of the crane would slip and spin in the mud, and that if they were spinning and suddenly got onto something solid they would lurch around, which is what happened on this occasion; that Cantrell motioned him "to move up" and in moving up "you get a lurching action either way you move," that when he got Cantrell's signal it was by hand signal over the side of the box, that all he could see of him was his hand and that he could not tell whether he was sitting, standing or what he was doing; that the platform was as high as it needed to be but he needed to move it in to the gate, that when he did so one track would spin and the other would pull.

Klutts also testified at the trial, saying that on May 30 there never was an operation in which he either was required to or did put the lever in a position to move the boom right or left, that there was never any necessity for moving the boom to the right or to the left; that during the entire morning of that day the only levers he used were those causing the platform and boom to move up or down and those that caused the crane itself to go forward or backward, that to move the crane forward or backward it had to be in "travel gear," and that to utilize the turntable for the purpose of moving the boom either to the right or to the left, it would be necessary to put the machine in "swing gear," and that he had not done so that whole day; that shortly before his fall Cantrell had given him the signal to go forward to the gate, and that as he started forward he did not put the lever in the wrong position, but the right track spun and the left track pulled, causing the crane and the boom to move about a foot or a foot and a half to the right, and that as he started slipping to the right the platform that these men were on also suddenly lurched to the right 15 to 18 feet; that the house or cab that he was in also moved to the right, which was caused by "slippage of the brake," and that from his experience when you have an 80 foot boom with a platform and two grown men on it and there is a slippage to the right, the lurching action would cause the brake to slip some, "and that is what happened this time."

Klutts then said on cross-examination that on the day before the accident he had had to move the turntable to one side or the other because the platform got up against the concrete, but that on the day of the accident this had not been necessary. A few moments later he testified that he had operated the turntable on the day of the accident, and that to do so he used the same levers that he used to move the crane forward or backward. He further said that undoubtedly it was a violent swing when Cantrell was thrown out; that he did not have violent swings like that when he went over this same ground once or twice before but he did this time.

██ Of course, it is well established that negligence is never presumed and that the occurrence of an acicdent is not of itself evidence of negligence. Rankin v.

Nash-Texas Co., 129 Tex. 396, 105 S.W.2d 195, 199 (1937). While the evidence here is not strong and almost altogether circumstantial, in our opinion there was sufficient evidence to support the submission of Special Issues Nos. 1, 2 and 3, and we cannot say that there was no evidence to support the findings in response thereto.

Klutts' only explanation of the lurching was that in moving the entire crane forward through the mud the tracks on one side obtained traction while those on the other were spinning in the mud, all of this being beyond his control.

However, although Klutts testified that he had raised the platform high enough, although not close enough to the gate, for the removal of the tape and that he was propelling the entire crane in toward the gate when the lurching occurred, it appears from the testimony of the witnesses Bates, Weddel and Massengale that the platform was in close enough to the gate but lacked six or eight feet of being high enough.

This latter testimony, considered with Bates' further testimony that the platform collided with the gate immediately before Cantrell fell, could lead to the inferences (1) that Cantrell gave Klutts the wrong hand signal, or (2) that Klutts misread or misunderstood the signal, and (3) that if he had left the crane where it was in the mud and merely raised the platform six or eight feet this could have been accomplished without mishap. The jury might reasonably have inferred from all of the above testimony and the attendant circumstances that Klutts did so negligently handle the machine as to cause the lurching of the platform and that such negligence was a proximate cause of Cantrell's death. Therefore, we sustain the first point of error.

By their second point of error appellants insist that there was sufficient evidence to support the jury's answers to Special Issues 4, 5 and 6 finding that Klutts negligently failed to warn Cantrell of the movement of the platform to the right, proximately causing his death. Of course, it is undisputed that no such specific warning was given; but appellants in their briefs point to no evidence to support the finding that this failure to warn was negligence, and we find none. There was no way for Klutts to communicate such a warning to Cantrell. The noise of the machine was so loud as to make vocal communication between them impossible. No telephone or radio had been provided, and the only hand signals agreed upon between them were those given by Cantrell to Klutts. We hold as a matter of law that under the circumstances the failure to warn was not negligence. The second point of error is overruled.

The defendant's first and second cross-points, asserting insufficiency of the evidence to support either of the jury's findings of primary negligence, and that such findings are against the great weight and preponderance of the evidence, are overruled insofar as they refer to the findings that Klutts negligently moved the platform proximately causing Cantrell's death. Insofar as they refer to the other act of alleged primary negligence, they are sustained.

### Contributory Negligence

The defendant pled that Cantrell was negligent in (1) failing to keep a proper lookout, (2) failing to hold on to the platform, and (3) in standing up while the platform was moving. The jury declined to find that he did any of these things. The defendant contends that as a matter of law he was guilty of such negligence proximately causing his death. Appellants contend, on the other hand, that such acts were not established as a matter of law and that there was no evidence to support the submission of issues thereon. By appropriate cross-points the defendant urges that if the take-nothing judgment was erroneous it should not be reversed and rendered, but should be remanded for a new trial because the jury's negative findings mentioned above are so against the great weight and preponderance of the evi-

dence as to be manifestly wrong and unjust.

No witness saw whether Cantrell was standing or sitting when he fell. James Weddel was on the platform with him and testified that when the platform stopped six or eight feet short of the top of the gate Cantrell "got up there then and proceeded back on the left side of me where I couldn't see him," and that when the platform lurched Cantrell was standing behind him. However, on cross-examination he said that he did not see Cantrell to know whether he was standing or sitting immediately before he fell, but that he was pretty positive he was standing because he had to make "some kind of a motion to the crane driver," that "you have to stand to see the crane driver." At the trial he said that it was just a matter of seconds after Cantrell passed behind him that he fell.

■ We find no evidence as to whether Cantrell did or did not keep a proper lookout, or as to whether he did or did not hold on to the platform. We hold, therefore, that the defendant has failed to carry its burden to show these acts of negligence by a preponderance of the evidence. Accordingly, the defendant's third cross-point is overruled, and appellants' Point of Error 3 through 6 are sustained.

However, we think the evidence on the question of whether Cantrell was standing when he was thrown from the platform, though circumstantial, is quite persuasive that he was standing, so persuasive, in fact, that we sustain defendant's fourth cross-point asserting that the finding to the contrary is so against the weight and preponderance of the evidence as to be manifestly wrong. Appellants' seventh point of error, asserting that this fact was not established as a matter of law, is sustained, but their eighth point of error, saying there was no evidence to support the submission of this issue, is overruled.

■ Appellants assert generally, in their eleventh point of error, that Cantrell's contributory negligence causing his death was not established as a matter of law. We agree. This point of error is sustained.

### The Volenti Defense

The *volenti* doctrine and the rules governing its application are set out and discussed at length in the following cases: Levlon v. Dallas Ry. & Terminal Co., 117 S.W.2d 876, 878 (Tex.Civ.App., Dallas 1938, writ ref'd); Wood v. Kane Boiler Works, 150 Tex. 191, 238 S.W.2d 172 (1951); Schiller v. Rice, 151 Tex. 116, 246 S.W.2d 607 (1952); McKee, General Contractor v. Patterson, 153 Tex. 517, 271 S.W. 2d 391 (1954); Harvey v. Seale, 362 S.W. 2d 310 (Tex.1962); Halepeska v. Callihan Interests, Inc., 371 S.W.2d 368 (Tex.1963); and Ellis v. Moore, 401 S.W.2d 789, 793 (Tex.1966). See also "Assumption of Risk," by Greenhill, 16 Baylor L.Rev. 111.

■ It appears from the undisputed evidence that the ride on the platform at a height of more than 50 feet from the ground was a hazardous or dangerous undertaking. There seems to have been no question but that when the crane itself was in movement the platform vibrated, shook, bounced and swayed. Moreover, it cannot be denied that Cantrel had knowledge of these facts; but there is no evidence that he knew that the platform might suddenly and swiftly lurch to one side or the other a distance of 15 to 20 feet, or that he fully appreciated the nature and extent of such action so that he could make an intelligent choice of riding or refusing to ride on the platform, and we cannot say as a matter of law that the evidence was such as to charge him with such knowledge or appreciation.

We think this feature of the case is governed by Halepeska v. Callihan Interests, Inc., supra, Triangle Motors of Dallas v. Richmond, 152 Tex. 354, 258 S.W.2d 60 (1953), Wood v. Kane Boiler Works, supra, and Scott v. Liebman, 404 S.W.2d 288, 292, 293 (Tex.1966). In *Triangle Motors* the plaintiff unquestionably knew and appreciated the danger of falling through the open, unguarded elevator shaft.

However, he did not know the elevator was above him, and it was held that he did not assume the risk of being struck, as he was, when it descended. Likewise, in Wood v. Kane Boiler Works, the injured plaintiff knew of and appreciated certain dangers incident to his work, but he was injured as a result of a defect concerning which he had no knowledge or appreciation. See also United States v. Johnson, 288 F.2d 40, 45 (5 Cir. 1961), and E. L. Farmer & Co. v. Hooks, 239 F.2d 547, 552 (10 Cir. 1956), Cert. den., 353 U.S. 911, 77 S.Ct. 669, 1 L.Ed.2d 665.

The jury found in answer to Special Issue No. 20 that "the characteristics of the platform mounted on the boom and occupied by I. D. Cantrell were open and obvious to him," but in answering Special Issue No. 21 the jury declined to find that Cantrell "had full knowledge of the characteristics of the platform mounted on the boom."

■ Under the doctrine in question, the burden was on the defendant either to establish by undisputed evidence, as a matter of law, or obtain favorable jury findings, that Cantrell not only knew that there was some danger in riding the platform, but also that he knew and appreciated the particular danger involved, that of being actually thrown from the platform by a sudden lurching thereof a distance of 15 to 20 feet. Ellis v. Moore, supra. We interpret the finding in response to Special Issue No. 21 as a failure to find as a fact the existence of an essential ingredient of the *volenti* defense, to-wit, that Cantrell had full knowledge and appreciation of the greater danger. See also Scott v. B. & B. Drilling Co., 275 S.W.2d 182, 183 (Tex. Civ.App., El Paso 1954, no writ).

■ Appellants' ninth point of error asserts that defendant failed to establish as a matter of law that Cantrell was warned of the likelihood that the platform would lurch and sway, and their tenth point of error asserts that there was no evidence to support the submission of Special Issue No.

16. The ninth point is sustained but, as shown above, there was at least some evidence to support the submission of the issue, and the tenth point of error is overruled.

Appellants' twelfth point of error, asserting that the defendant failed to establish as a matter of law that Cantrell knew and appreciated the extent of the danger in riding the platform, or that he voluntarily exposed himself to such a known and appreciated danger, is sustained. However, we overrule appellants' thirteenth point of error asserting that there was "no evidence" to support the submission of issues under the *volenti* doctrine.

The defendant's fifth and sixth cross-points, asserting that in event of reversal the case should be remanded because the jury's answers to Special Issues Nos. 16 and 21 are so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust, are overruled.

In their fourteenth point of error appellants assert that affirmative answers of the jury to Special Issues Nos. 21, 22 and 23 would not have supported a judgment for the defendant. We do not deem it necessary to pass on this point as it is theoretical, speculative and irrelevant in the light of the jury's negative answer to Special Issue No. 21.

In their Points of Error 15 through 18 appellants level certain criticisms at the jury's finding, in answer to Special Issue No. 20, that "the characteristics of the platform" were open and obvious to him. Without going into a lengthy discussion of the various legal questions raised by these points, we sustain them and merely hold that the finding in question is ineffectual to form a basis for judgment. It is not so phrased as to make it clear to the jury that the lurching proclivities of the platform were included in the rather nebulous term "characteristics." Moreover, the issue was not accompanied by other issues inquiring as to whether Cantrell knew of the danger, if any, inherent in the "characteristics"

of the platform and appreciated such danger and, despite such knowledge and appreciation, voluntarily exposed himself to the risk.

### The Special or Loaned Employee Defense

When the verdict was first returned, it contained the jury's answer to Special Issue No. 24 finding that Klutts *was* a special or loaned employee of Mosher Steel Company. The trial judge ruled that this was in conflict with the finding (No. 7) that Klutts was in the course of his employment for the defendant, and required the jury to endeavor to resolve the conflict. This the jury did by changing the answer to Special Issue No. 24 to make it read, "He was not a special or loaned employee."

Appellants contend by their Points of Error 19 through 23 that there was sufficient evidence to support the answers to both Special Issues Nos. 7 and 24, although there was insufficient evidence to support the submission of the latter, and that an affirmative answer to the latter issue would not have supported a judgment for the defendant, and that defendant had failed to establish as a matter of law that Klutts was such a special or loaned employee. By its seventh cross-point the defendant contends that the court erred in requiring the jury to deliberate further.

The only testimony bearing on the question of whether the two employers had agreed on which of them had *the right to direct and control the conduct of Klutts* in the operation of the crane consisted of the deposition testimony of LaVon Massengale, Jr. and Albert E. Harwell.

Massengale, defendant's supervising partner at the dam, testified that after the Mosher employees arrived it became obvious that they would need mechanical help in reaching the gates; that after first offering them certain ladders, which were declined as being too unwieldy, he offered the use of the crane with the platform fastened to the tip of the boom, which was accepted; that the crane was rented to the Mosher employees on an hourly basis, as was the operator Klutts; that as far as the actual movements of the machinery were concerned, they were under Cantrell's direction by hand signals; that Cantrell had the authority to control the operator in the operation of the crane because it was under his direction; that they assigned Klutts to "this crew," that Cantrell was the foreman of this operation "and a dragline operator works for the foreman and the signal man"; that if he had wanted Klutts, or to use that machine, he would have gone to Cantrell and not to Klutts, as he was "their employee." Massengale further testified that he had agreed in advance with Al Harwell, of the Mosher Steel Company, on the renting of the equipment and the operator for this purpose. However, when asked on cross-examination if he ever discussed with Harwell specifically about renting the crane or merely said that he would furnish whatever was necessary, he said: "I can't say for sure. I am sure the crane was mentioned because we discussed at length the different ways of doing it."

Harwell, Mosher Steel Company's service manager, denied having made any such agreement, and said that the matter was not even discussed.

■ This presents a difficult question. Our Supreme Court has held that it is primarily a question of contract between the general employer and the alleged special employer, and that the solution of the problem in the final anaysis lies *in the right of control of the manner in which the employee performs the services necessary to accomplishment of his ultimate obligation.* Producers Chemical Co. v. McKay, 366 S.W.2d 220, 225 (Tex.1963); J. A. Robinson Sons, Inc. v. Wigart, 431 S.W.2d 327, 334 (Tex.1968).

It is also held in the latter case that "a truck driver might remain under the direction and control of his general employer in regard to the details of caring for his equipment and operating in a safe manner, and still be a special or a loaned employee

of one who was directing and controlling the particular activity which resulted in an injury." Nevertheless, we think the general employer's right at all times to direct the activities of Klutts in caring for complicated and valuable machinery entrusted to his care is a factor to be considered, although not conclusive, in the case at bar. The fact that Cantrell did actually direct at least some of Klutts' activities is also a factor entitled to be considered, but it is by no means conclusive.

It has been said also that the question to be determined is whether it is understood between the employee and the two alleged employers that he is to remain in the allegiance of the first as to a specific act, or is to be employed in the business of and subject to the direction of the temporary employer as to the details of such act; that this is a question of fact in each case; also that in the absence of evidence to the contrary, there is an inference that the employee remains in his general employment so long as, by the service rendered another, he is performing the business entrusted to him by the general employer, and that a continuation of the general employment is indicated by the facts that the time of employment is short, that the lent servant has the skill of a specialist, and that the general employer may at any time substitute another servant in his place. "There is no inference that because the general employer has permitted a division of control, he has surrendered it." Restatement of Agency, § 227, pp. 500–501; Halliburton Oil Well Cementing Co. v. Paulk, 180 F.2d 79, 83 (5 Cir. 1950), Cert. denied 340 U.S. 812, 71 S.Ct. 38, 95 L.Ed. 596.

We think it clear that there was sufficient evidence to support finding No. 7. Also, in our opinion, it is clear that the defendant did not establish as a matter of law that Klutts was a special or loaned employee, and that there was sufficient evidence to support the finding that he was not such an employee of Mosher Steel Company. Therefore, appellants' 19th, 20th and 21st points of error are sustained.

Point of Error No. 22, asserting that the evidence did not support the submission of Special Issue No. 24, and Point No. 23, asserting that a jury finding that Klutts was such a special or loaned employee would not have supported a judgment for the defendant, are both overruled, as is defendant's seventh cross-point. It does no good to theorize on the mental processes of the jurors in an effort to establish consistency between these two findings; they could not together form a basis for judgment, and in that sense they were in conflict.

Since there was sufficient evidence to support one finding of primary negligence and proximate cause, and the defendant has not shown itself to be entitled to judgment as a matter of law notwithstanding those findings, the judgment must be reversed. However, in view of our holding that the finding that Cantrell was not standing on the platform while it was in motion is against the great weight and preponderance of the evidence, the case must be remanded.

The judgment appealed from is reversed and remanded for another trial.