**Celia A. LARA, Individually and Next Friend of Raul V. Lara, Jr., et al., Appellants,**

v.

**Charlie LILE, Individually, and d/b/a Raven Transport and Raven Supply, Appellee.**

No. 13-91-084-CV.

Court of Appeals of Texas, Corpus Christi.

April 2, 1992.

Rehearing Denied April 30, 1992.

William J. Tinning, Corpus Christi, for appellants.

Douglas M. Kennedy, Alan J. Couture, Corpus Christi, for appellee.

Before DORSEY, GILBERTO HINOJOSA and BISSETT,[1] JJ.

OPINION

DORSEY, Justice.

Celia A. Lara, individually and as next friend of Raul V. Lara, Jr., Roland Thomas Lara, and Lillia Maria Lara, minors, and on behalf of the Estate of the late Raul V. Lara, deceased, and on behalf of all those entitled to bring suit for his death, appeal a summary judgment entered in favor of Charles Lile, individually and d/b/a Raven Transport and Raven Supply in the Laras' suit for wrongful death. The Laras contend by three points of error that the trial court erred in granting special exceptions and in granting the summary judgment. We reverse the trial court's judgment.

Raul Lara was killed during the course and scope of his employment with Heldenfels Brothers, Inc., when a flatbed truck, then being driven by Heberto Hernandez, Lile's employee, crushed him after he and a co-worker ducked under the flatbed portion of the truck to escape a sudden rainstorm on the job site.

The Laras brought suit against Heldenfels Brothers and Lile. They alleged in all of their petitions that Lile was the owner and operator in control of the truck that crushed Lara, and that Hernandez, without making the appropriate inspections and lookout, and contrary to instructions, moved the truck, causing fatal injuries to the decedent.

■ The Laras complain by their second point of error that the trial court erred in granting summary judgment for Lile because there were genuine issues of material fact regarding whether Lile's driver was a borrowed servant of Heldenfels Brothers. Summary judgments are reviewed in accordance with the following standards:

1. The movant for summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.

2. In deciding whether or not there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true.

3. Every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in its favor.

GOV'T CODE ANN. § 74.003 (Vernon 1988).

---

1. Assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to TEX.

*Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548–59 (Tex.1985). The question on appeal is whether the summary judgment proof establishes as a matter of law that there is no genuine issue of fact as to one or more of the essential elements of the plaintiff's cause of action. *Gibbs v. General Motors Corp.,* 450 S.W.2d 827, 828 (Tex.1970). The summary judgment evidence in this case fails to conclusively prove that Hernandez was Heldenfels' servant as a matter of law at the time he ran over Lara.

The borrowed servant doctrine is the linchpin of the defendant's motion for summary judgment. The doctrine is predicated upon respondeat superior, the concept by which the master is vicariously liable for a servant's torts committed in the course and scope of employment, without regard to the negligence of the master, whether during the supervision or hiring of the servant or otherwise.

The borrowed servant doctrine is implicated when the nominal or general employer loans or supplies an employee to another, who is termed the special employer. The negligence of the servant is attributed to the new, temporary, or special employer, and the original or general employer is exonerated. The doctrine shuns joint responsibility for the actions of the employee based upon the relative right to control the employee, and instead holds one master responsible for the tort of the employee, absolving the other. The issue is which master the servant was following at the time of the tortious act.[2]

The borrowed servant doctrine is discussed in Restatement (Second) of Agency § 227 (1958), "Servant Lent to Another Master." Section 227(b) states that,

in the absence of evidence to the contrary, there is an inference that the actor remains in his general employment so long as, by the service rendered another, he is performing the business entrusted to him by the general employer. *There is no inference that because the general employer has permitted a division of control, he has surrendered it.* (emphasis added).

The question is which employer has the right of control over the actions of the employee. Beginning with the inference that the general employer retains control, the inquiry goes to what control he has surrendered to the special employer.

Several factors enumerated in § 227(c) of the Restatement are helpful in analyzing the contrast between the general employer's retention of right of control over his employee and the right of control of the special employer. These factors include situations in which (1) the machine utilized by the borrowing employer is both owned by the general employer and operated by the general's employee; (2) the servant is expected to operate the machine in the way his general employer would expect while giving only the results called for by the borrower; (3) the general employer can substitute another employee at any time; (4) the servant is borrowed for merely a temporary period of time; (5) the employee has the skill of a specialist.

Moreover, the Restatement suggests that when the employee performs the acts directed by the borrowing employer, not only is the latter liable for having directed that action, but the general employer remains liable if the act fell within the scope of the employee's general employment.

In reviewing the trial court's granting of a motion for summary judgment, we review the evidence in the light most favorable to the non-movant. *Cate v. Dover Corp.,* 790 S.W.2d 559, 562 (Tex.1990); *Acker v. Texas Water Comm'n,* 790 S.W.2d 299, 302 (Tex.1990); *Nixon,* 690 S.W.2d at 548–59. Here, the motion for summary judgment was based upon the defense that the employee, Hernandez,

---

2. The Biblical doctrine that one may only serve one master is followed in the law of the borrowed servant. However, unless the obligations to the masters conflict, so that the servant must choose between those obligations, the servant is usually fulfilling his obligations to both. There-fore, unless the servant has a dilemma regarding which master he should obey, there is no reason to exculpate one and bind the other vicariously for the sin of the servant. *See* Restatement (Second) of Agency § 227 (1958).

whose negligence was alleged to have caused the death of Lara, was not the employee of Lile, but had been loaned to Heldenfels. Lile had the burden of establishing as a matter of law that Hernandez was the employee of Heldenfels as special employer, rather than of Lile, as general employer. If there was a factual issue, the granting of the summary judgment was improper.

The undisputed facts are as follows: on August 1, 1988, the date of this accident, Heldenfels Construction Company was working on a road construction job site located in Flour Bluff, Texas, on Park Road 22. Charles Lile, appellee in this suit, owned Raven Transport and Raven Supply, which contracted with Heldenfels to deliver concrete boxes to be used in the construction of drainage culverts at the site. The boxes were transported and delivered to the job site, one at a time, on 40-foot flatbed trailers. The trailers were pulled by trucks (tractors) driven by Lile employees. The trailers and tractors were owned by Lile. The contract between Heldenfels and Lile/Raven did not address the relative rights of control over the truck drivers.

Once the Raven driver arrived at the job site, the driver spoke with Bennie Martinez, the Heldenfels overall supervisor, who told the Raven driver where to move his truck. Sonny Ham, the job superintendent, also directed the movement of the trucks, as did a Heldenfels' spotter. Because three trucks delivered concrete boxes simultaneously, drivers often had to wait for instructions to move to a ditch area or wait to have their boxes unloaded. Raven drivers were told when and how to back up, move, and position their trucks; drivers were instructed to move at the command of a Heldenfels employee.

On the day of the accident, Heberto Hernandez, a Raven employee and truck driver, arrived at the job site shortly before 8:00 a.m. and spoke with Martinez, who directed him to the ditch site and later motioned him to back up to the ditch and park. A few minutes later, Hernandez moved the truck forward (it is disputed whether he moved on his own or was directed to do so), then was motioned to stop. Only after he stopped did he learn that he had run over appellant Lara.

Other matters are disputed, however, principally the amount of control Heldenfels and Raven exerted over Hernandez when this accident occurred.

Hernandez himself claimed that he was only allowed to move his truck on the job site as directed by the Heldenfels employees. He stated that at the time of the accident, Martinez told him to move forward. He said he did so, then stopped on command, thinking he was following Heldenfels' construction orders. Finally, Hernandez claimed that he did not honk the horn while moving his truck because no one instructed him to do so, and because he saw no reason for it.

Sonny Ham, Jr., Heldenfels' superintendent, stated that Heldenfels could terminate Raven employees for unsatisfactory performance on the job site. Furthermore, both he and Martinez gave instructions to the Raven employees, the two most important of which were not to move unless directed to do so by a Heldenfels employee, and to sound the horn when moving. Ham claimed that Martinez directed all truck movement on the day of the accident, and that Hernandez moved forward because Martinez told him to do so, using both a verbal and a hand signal.

Benny Martinez, in his deposition, stated that all of the drivers attended an instructional meeting about an hour or two before this accident occurred. Martinez said he instructed Hernandez to move the truck forward.

Armando Escatiola, one of Lara's co-workers and a fellow member of the unloading crew, testified that at the time of the accident, he was standing on Hernandez's trailer. Escatiola stated that he did not see or hear anyone tell the driver of the truck to move. In fact, Escatiola testified that it was his job to tell Hernandez to move the truck, after he'd hooked cables to the culvert being unloaded and then dismounted the truck.

Finally, Charles Lile was not on the job site at the time of the accident. However,

he testified about the overall control he had over his employees at the site. Lile stated that on the day of the accident, he relieved Hernandez of his duties and brought in another driver because Hernandez was so upset. He further stated that "my job is to get it [the concrete box] to the job site; when it gets there, the Heldenfels people tell him [Raven's truck driver] what to do." Lile stated, however, that the drivers do not necessarily move only at the direction of the Heldenfels people. Lile testified that his company is currently still working at the site and that he has not implemented any of his own procedural changes since the accident. His company's drivers have since been asked by Heldenfels, however, to honk their horns when in motion on the site.

In *J.A. Robinson Sons, Inc. v. Wigart*, 431 S.W.2d 327, 334 (Tex.1968), the Supreme Court held that determining who had the right of control over the tortfeasor employee at the time of the accident was the critical inquiry. In *Wigart*, the plaintiff was injured when a truck was being unloaded and the driver was a general employee of the trucking company, but was being directed in the unloading by agents of another. "Under these circumstances, right of control of the manner of operating the équipment is the decisive factor, not control of the result to be accomplished by the equipment." *Id.* at 334. The Court held that the applicability of the borrowed servant doctrine must be reviewed on a case-by-case basis, and that a fact issue existed in that case regarding which employer had the right of control over the operation of the truck at issue. *Id.* at 332. The evidence failed to establish that the driver was a borrowed servant as a matter of law.

In *Producers Chem. Co. v. McKay*, 366 S.W.2d 220, 226 (Tex.1963), the Court held, "we must carefully distinguish between authoritative direction and control, and mere suggestion as to details or the necessary cooperation, where the work furnished is part of a larger undertaking." In that case, the special employment was brief, the general owned the machinery used on the site, and the employee was accountable solely to the general employer regarding operation of that machinery. There was no evidence that the special employer could have replaced the employee with an operator of its own choosing. The Court found that the special employee's directions regarding merely when to start and when to stop in coordination with the other employees' work on the ultimate project did not constitute control over the employee to the extent that the borrowed servant doctrine applied. *Id.* at 226.

In *Cantrell v. Markham & Brown Co.*, 452 S.W.2d 940, 948 (Tex.Civ.App.—Dallas 1970, writ ref'd n.r.e.), the court held that the general employer must establish as a matter of law that his employee was the borrowed servant of another at the time of the tortious action. *Id.* at 948. The court applied Restatement §§ 227(b) & (c) and found that the general could not establish as a matter of law that his employee was a borrowed servant. *Id.* at 947–48. The court reiterated that it cannot be inferred that because the general employer has permitted a division of control, he has surrendered it. *Id.* at 948.

In the case at bar, several factors support the proposition that Lile remains liable for Hernandez's tortious acts. Lile owned the truck driven by Hernandez at the time of this accident. Lile had a contract with Heldenfels to deliver culverts to the latter's job site, and that contract did not address the right of control of Lile's truck drivers. Although Lile's employees followed Heldenfels' employees' directions once they entered onto the job site, Lile continued to hold his employees on his payroll and to control them, particularly in their manner of operating and caring for his equipment. Finally, Lile could replace each employee assigned to deliver the culverts with another employee of his own choosing, and he did so after this accident occurred, replacing a badly shaken Hernandez with another Lile employee.

Because Lile was the movant for summary judgment in this case, he had the burden to rebut the inference that he retained control over Hernandez while he worked on the Heldenfels job site. Lile

had to establish as a matter of law that Hernandez was Heldenfels' borrowed servant when he rolled over Lara with his truck, killing him. There is no undisputed evidence of the surrender of the right of control of the driver to the degree that he became Heldenfels' employee as a matter of law. Although liability could perhaps attach to Heldenfels for the failure to adequately exercise its right of control, as held in *Pollard v. Missouri Pacific R.R. Co.*, 759 S.W.2d 670, 671 (Tex.1988), such an issue is not presented here. Appellants' second point of error is sustained.

■ In their original and first amended original petitions, the Laras brought, in addition to an action for wrongful death, an action for violation of the Deceptive Trade Practices Act.[3] Specifically, in Paragraph IV, the Laras alleged that:

> The decedent was crushed beneath the truck receiving severe and ultimately mortal injuries and was conscious until the time of his death at Memorial Hospital in Nueces County, Texas, because of defects and breaches of express or implied warranties and/or representation pursuant to the Texas Deceptive Trade Practices Act (DTPA), Art. 17,46(b), subsection 1, 3, 5, 7, 9, 11, 12, 13, 23, and 17.50, express or implied warranties.

Lile specially excepted to the Laras' first amended original pleading, contending that "Plaintiffs' decedent was not a consumer under the DTPA and, therefore, as a matter of law, Plaintiffs are not entitled to recover under the DTPA." The court granted the special exceptions. Subsequently, in accordance with the trial court's order, the Laras filed an amended original petition which did not contain a DTPA cause of action.

■ The Laras contend by their third point of error that the trial court erred in granting Lile's special exception, which required the Laras to strike the DTPA cause of action from their pleadings. Special exceptions are allowed by Tex.R.Civ. P. 91, which states that a special exception shall point out the insufficiency in the pleading excepted to. When the plaintiff's plead-

ings are insufficient because they fail to state a cause of action, the defendant may file special exceptions, specifically pointing out the defect or reason that the plaintiff's claim is invalid. If the special exceptions are sustained, the plaintiff must then be given an opportunity to amend his pleadings before the case may be dismissed for failure to state a cause of action. *See Texas Dep't of Corrections v. Herring*, 513 S.W.2d 6, 9–10 (Tex.1974); *Moseley v. Hernandez*, 797 S.W.2d 240, 242 (Tex.App.— Corpus Christi 1990, no writ); Tex.R.Civ. P. 90, 91.

■ In the present case, Lile properly used special exceptions to challenge the Laras' pleading as failing to show that Raul Lara was a "consumer" for purposes of asserting the DTPA claim. The DTPA does not require a party to specifically refer to itself as a "consumer" when pleading its cause of action under the act. *First Title Co. of Corpus Christi, Inc. v. Cook*, 625 S.W.2d 814, 817 (Tex.Civ.App.—Fort Worth 1981, writ dism'd); *Ridco, Inc. v. Sexton*, 623 S.W.2d 792, 794–95 (Tex.Civ. App.—Fort Worth 1981, no writ). The complaining party need only allege facts showing that it fits within the act's definition of "consumer." *Cook*, 625 S.W.2d at 817; *Sexton*, 623 S.W.2d at 794–95. The issue on appeal, then, is whether the petition alleged facts sufficient to show that Lara was a "consumer" under the DTPA.

■ The DTPA defines a "consumer" generally as one "who seeks or acquires by purchase or lease, any goods or services." Tex.Bus. & Com.Code Ann. § 17.45(4) (Vernon 1987). The plaintiff establishes standing as a consumer in terms of his relationship to the transaction, not by a contractual relationship with the defendant. *Birchfield v. Texarkana Memorial Hosp.*, 747 S.W.2d 361, 368 (Tex.1987). Thus, the plaintiff may "acquire" goods or services that have been purchased by another for the plaintiff's benefit. Specifically within the context of the employment relationship, our Supreme Court has held that an employee who was covered by a group insur-

---

3. Tex.Bus. & Com.Code Ann. §§ 17.41, *et seq.* (Vernon 1987).

ance policy, which had been negotiated by his employer, was a "consumer" under the DTPA, because he "acquired" the goods or services of the insurer, even though he did not personally seek or purchase them. *Kennedy v. Sale*, 689 S.W.2d 890, 892 (Tex. 1985).

■ However, a person who has no relationship to the sales transaction may not be a consumer of the goods or services under the DTPA. In *Rodriguez v. Ed Hicks Imports*, 767 S.W.2d 187, 191 (Tex.App.—Corpus Christi 1989, no writ), for instance, we held that the passenger in an automobile which had been purchased by and for someone else was not a "consumer" under the DTPA for purposes of bringing an action against the seller for injuries caused by defects in the automobile. Thus, the goods or services provided to the employer by a third party must have some relationship to the employee in order for him to be considered a consumer under the DTPA. Specifically, in *Munoz v. Gulf Oil Co.*, 732 S.W.2d 62, 66 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.), the Court denied consumer status to an employee with regard to a number of distributors of propane gas sold to the employer that caused injury to the employee.

The pertinent question is what was Lara to acquire or receive from Raven. The only service performed by the trucking firm was the transportation of culverts from one location to another. Raven's trucking service was not sought, received or acquired by Lara, nor did it benefit Lara. Raven serviced Heldenfels in the course of its construction job. The only connection between Lara and Raven consisted of both parties performing work for Heldenfels, Lara as an employee and Raven as a subcontractor.

Appellants argue that Lara had a relationship to the transaction between Heldenfels and Raven in that Lara and the other workers on the construction site "acquired" the benefits of a safe place to work from Raven; in other words, the Heldenfels workers acquired the benefits derived from Raven's drivers being careful or safety-conscious while making deliveries to the job site. However, transportation was the primary service acquired; safety was incidental, albeit essential. The primary service acquired was not for the benefit of the Heldenfels employees, and was not received or acquired by them.

We hold that Lara did not acquire services from Raven, and accordingly was not a consumer of its services under the Deceptive Trade Practices Act. We overrule point of error three.

Finally, the Laras complain by their first point of error that the trial court erred in granting the motion for summary judgment because less than twenty-one days' notice was given to them prior to the summary judgment hearing. On November 10, 1989, Lile filed a motion for summary judgment. On November 21, 1989, the Laras responded. A hearing on Lile's motion for summary judgment was scheduled for December 4, 1989. The trial court held the hearing on November 29, 1989, however, less than 21 days after Lile filed his motion. Nonetheless, counsel for both Lile and the Laras appeared at the hearing.

■ When counsel appears on the day of the hearing, he may not challenge the summary judgment solely on the ground that he had no advance notice of the hearing date. *Lofthus v. State*, 572 S.W.2d 799, 800 (Tex.Civ.App.—Amarillo 1978, writ ref'd n.r.e.). Moreover, to preserve a complaint for appellate review, a party must present a timely objection and obtain an adverse ruling. *Daniel v. Esmaili*, 761 S.W.2d 827, 829 (Tex.App.—Dallas 1988, no writ); Tex.R.App. P. 52(a). Conspicuously missing from the record is a statement of facts relating to the hearing on the motion for summary judgment. We cannot therefore determine from the record whether appellants did in fact object to the hearing date. Appellants' complaint presents nothing for our review. The Laras' first point of error is overruled. We reverse and remand for trial on the merits.

BISSETT, J., concurring and dissenting.

BISSETT, Justice, concurring and dissenting.

I concur with the holding by the majority that Lara was not a consumer under the Deceptive Trade Practices Act, and that appellant's third point of error was correctly overruled. I further concur with the holding by the majority that appellants' first point of error was properly overruled since the point presents nothing for review. However, in my opinion, the summary judgment evidence conclusively proved that the driver of Raven's truck was Heldenfels' borrowed servant as a matter of law. Therefore, I do not agree that the appellants' second point of error would be sustained, and I dissent from that portion of the majority's holding.

The majority summarizes the summary judgment evidence. I will set out *verbatim* the deposition testimony of each witness insofar as the testimony of the several witnesses relates to the issue of the right to control Lile's truck drivers. Charlie Lile, individually, and d/b/a Raven Transport and Raven Supply, appellee, (hereafter "Lile"), movant for summary judgment, relies upon the testimony of himself, that of Heberto Hernandez, that of Benny Martinez and that of William "Sonny" Ham. Celia A. Lara, in the several capacities in which she sued, appellant, (hereafter "the Laras") relies upon the testimony of Armando Escatiola and possibly that of Jordan S. Mathias.

The issue to be decided is whether Hernandez was a "borrowed servant" of Heldenfels. This majority holds that there is a question of fact on this issue. I disagree. I would hold that Hernandez was a borrowed servant as a matter of law because at the time of the accident, Hernandez was under the exclusive control of Heldenfels.

If the general employees of one employer are placed under the control of another employer in the manner of performing their service, they become special or borrowed employees of the latter. *Producers Chem. Co. v. McKay*, 366 S.W.2d 220, 225–26 (Tex.1963); *Francis v. Johnson*, 777 S.W.2d 462, 464–65 (Tex.App.—El Paso 1989, writ denied). When no written contract between the employers outlines the right of control, as is the case here, or when the contract is implied, the right of control is necessarily determined as an inference from the facts and circumstances relating to the scope of the general project, the nature of the work to be performed by the machinery and employees furnished, acts representing an exercise of actual control, and the right to substitute another operator of the machine. *J.A. Robinson Sons, Inc. v. Wigart*, 431 S.W.2d 327, 331 (Tex.1968); *McKay*, 366 S.W.2d; *Francis*, 777 S.W.2d at 464. Sometimes the only reasonable inference to be drawn from the facts and circumstances in evidence is that right of control of the manner in which the employee performs his duties is surrendered to the special employer. *McKay*, 366 S.W.2d at 226; *Francis*, 777 S.W.2d at 465.

Here, we do not have any evidence of a contract expressly ceding the right of control of Heldenfels. It is undisputed, however, that Lile and his company were to deliver culverts to the job site, and that Heldenfels was to construct the culverts on the site.

### LILE'S TESTIMONY

Lile was not at the job site at the time of the accident. He testified in relevant part, as follows:

Q   But in terms of your job, your company's job as far as the delivery goes when you went out there that was something self contained, something that your company was in charge of, the delivery?

A   My job is to get it to the job site.

Q   Okay.

A   When it gets to the job site then the Heldenfels people tell him what he needs to do.

\*   \*   \*   \*   \*   \*

Q   When a truck comes out there its coming down Padre Island Drive then it of course has to pull off to the construction site. When it comes to the construction site does the truck driver automatically know where he is

supposed to go or does somebody direct him?

A  No, he stops.

Q  Okay.  And where does he stop?

A  He stops inside the barricaded areas.

Q  And who is it that directs him where he needs to go?

A  Heldenfels Brothers.

\*　　\*　　\*　　\*　　\*　　\*

Q  Now, Mr. Martinez will then direct you or Mr. Hernandez or the other driver to go wherever the culvert is needed at that time; is that right?

A  Right.

Q  Is the driver for your company supposed to move on his own or only on the instructions of Mr. Martinez?

A  He moves when the—not necessarily—well, Mr. Martinez.

### HERNANDEZ' TESTIMONY

Hernandez worked for Lile as a truck driver.  He drove the truck which ran over and killed Raul V. Lara.  He testified in relevant part, as follows:

Q  Okay.  When you got out to the job site were you to move your truck once you got to the Heldenfels' job site on your own or only on the instructions from someone from Heldenfels like Bennie (Martinez)?

A  Only in the instructions from someone from Heldenfels.

\*　　\*　　\*　　\*　　\*　　\*

Q  Okay.  Now when you got out there on the day of the accident, let's go to that day.  You drove up just like you told us.  Did you see Bennie?

A  Yes, sir.

Q  Okay.  What did Bennie tell you to do?

A  Well, basically he told our first truck he backed up in there, we all helped him take off the chains and he—the crane they all hooked up all the stuff on the crane to take off the box.  They took off the box, moved off the truck, and he went out, you know, to go get another load.  I sat there.  They moved the box down to the ditch, they started setting and then they motioned

me to back up in there.  So they spotted me where I was supposed to park.  I parked there, got off the truck, removed the chains off the thing.  I was watching the guys work on the—down at the ditch.

Q  You were outside your truck?

A  Yes, sir.

Q  Okay.

A  I was there for several minutes and all of a sudden, you know, it just started to rain and started to rain pretty hard so everybody scattered, you know, they went out to their cars.  I saw them, you know—well, I saw some people run over to their cars so I walked up, climbed in the truck, I sat there for a couple of minutes and then Bennie Martinez knocked on my door.  I opened the door, he asked to move forward.  I looked at my right hand mirror, I saw where the crane was at, and figured, you know, he wasn't hooked up to the box or nothing and I released by brakes, put it in gear, moved forward.  Next thing, you know, they are hollering up.  I stop.  I figured that's where they wanted me to stop.  I put my brakes on.  I got off the truck and, you know, I heard a lot of commotion.  I walked over to the back.  That's where I saw the man laying on the ground and they told me, you know, that I run over him ...

\*　　\*　　\*　　\*　　\*　　\*

Q  Okay, the only one that told you to move out was Bennie, not a spotter?

A  Yeah.  Bennie was the one that told me to move.

\*　　\*　　\*　　\*　　\*　　\*

Q  Okay.  And the rules out there were that you didn't move without a spotter once you got on the site.

A  Yes, sir.

\*　　\*　　\*　　\*　　\*　　\*

### MARTINEZ' TESTIMONY

Bennie Martinez was a supervisor for Heldenfels on the date of and at the time of the accident.  It was his job when Lile's trucks reached the job site to tell the driv-

ers where to move their trucks in order to unload the culverts. Martinez conducted a meeting of all truck drivers about two hours before the accident occurred. Hernandez attended the meeting. Martinez instructed the drivers at the meeting not to move their trucks until they were told to do so. He further stated in response to the questions asked of him, as follows:

Q Now, when you say I moved the truck forward, what do you mean by that?

A I told the truck driver to.

Q Okay. And did you tell him that with hand signals, or did you go right up to his door and tell him?

A I went over there to his door.

Q Okay. And told him to move it forward?

A That's right.

Q And did you tell him how far you wanted him to move it?

A I told him to take the truck out of the way because we was going to bring the 245 caterpillar hoe and push the boxes together.

Q And when you told the driver to do that, did he move the truck like you told him?

A Yes, ma'am.

### WILLIAM "SONNY" HAM'S TESTIMONY

Ham was a superintendent for Heldenfels at the time of the accident. He testified in relevant part, as follows:

Q On the day of this accident, do you know who was doing the job of directing the truck where to go?

A Mr. Martinez

\* \* \* \* \* \*

Q Is it fair to say that once Mr. Hernandez, or, for that matter, any of the Raven drivers got to the Heldenfels' job site that they were exclusively under Heldenfels' direction and control as far as the work they were doing?

A Yes, ma'am.

Q And if you-all were dissatisfied with a Raven driver, did Heldenfels have the authority to run them off the job site?

A Yes, ma'am.

### ESCATIOLA'S TESTIMONY

Escatiola was an employee of Heldenfels on the day of the accident, and was working at the job site when the decedent was run over by the truck. His deposition was attached to appellant's response to appellee's motion for summary judgment. He testified in pertinent part, as follows:

Q How did they (the trucks) get to the site?

A To tell you the truth, I didn't see nobody to tell the truck to move, or to tell them to go somewhere.

Q I'm not talking about at the time of this accident. I'm talking about normally when a truck got to the outside of the construction—

A Well, they had to go—go get some more boxes—

Q When they got to the construction site, did a Heldenfels' employee tell them where the truck—tell the truck driver where to drive so that they could unload their truck?

A Yes, sir, where we were working at, they had to reverse it.

Q And a Heldenfels' employee would try to help the truck driver back in and tell him where to go?

A Well, yes, sir.

Q All right. Now, before this accident, the truck that was involved in this accident had already been backed up and put in place.

A Yes, sir.

\* \* \* \* \* \*

Q Well, do you—have—do you know of any reason why the truck driver would have moved if he wasn't told to move?

A Well, I don't know why the truck driver moved because I didn't see nobody tell him to move, and I didn't tell him to move.

### MATTHIAS' TESTIMONY

Matthias is a registered professional engineer. He was not a witness to the acci-

dent. The only testimony remotely concerning the right of control of Hernandez is his answers to the questions:

Q Okay. Would you agree with me that the—that the job safety rules with regard to movement of vehicles is really the responsibility of the person who is in control of the premises?

A Well, they have the ultimate responsibility, but I don't think that relieves say the truck driver of the necessity of playing by the rules.

Apparently, the majority bases its decision on the following factors stated in their opinion: 1) "although Lile's employees were temporarily following the orders of the Heldenfels people, Lile continued to hold his employees on his payroll and to control them, particularly in their manner of operating and caring for his equipment;" and 2) "Lile could replace each employee assigned to deliver the culverts with another employee of his own choosing, and he did so after this accident occurred, replacing a badly shaken Hernandez with another Lile employee." I submit that the above has no bearing on the issue of control of Hernandez after he had arrived at the construction site and had positioned his truck for unloading the culvert. Other factors which evidently furnish a basis for the majority's holding that a fact issue exists are the following excerpts from the opinion:

Escatiola stated that he did not see or hear anyone tell the driver of the truck to move. In fact, Escatiola testified that it was his job to tell Hernandez to move the truck, after he'd hooked cables to the culvert being loaded and there dismounted the truck.

Apparently, the majority holds that Escatiola's testimony creates a fact issue which precludes the rendition of summary judgment. I disagree. As heretofore stated, the issue is the right to control the actions of Lile's truck drivers after they had reached the construction site and were proceeding to position their truck in order to unload the box culverts. The identity of the Heldenfels' employee who instructed Hernandez to move the truck forward is immaterial to the controlling issue in this case. The fact that Escatiola testified that he did not see or hear anyone tell Hernandez to move the truck does not conflict with the testimony of Martinez, Ham and Hernandez that on the occasion in question Martinez told Hernandez to move the truck forward.

The evidence is undisputed that once Lile's truck driver arrived at the job site, he was under the *exclusive control* of Heldenfels (the general contractor), its employees, servants and agents. He was not to move his vehicle upon reaching the job site unless so ordered by an employee of Heldenfels. Therefore, Heldenfels assumed *total control* over the manner and performance of the movement of the truck by a truck driver after he had arrived at the job site. *Once on site*, the truck driver became the special or borrowed employee of Heldenfels Brothers, Inc., relieving Lile from vicarious liability for his acts. Whether the truck driver *then* violated specific orders of his special employer, Heldenfels, is *totally irrelevant* to the issue of vicarious liability between the truck driver and Lile. It might be relevant to the vicarious liability between the truck driver and Heldenfels, but neither Heldenfels nor the truck driver are parties to this lawsuit and the issue has *nothing at all to do with the summary judgment issues presented.* The Laras, appellants, settled their claim against Heldenfels prior to the filing of the motion for summary judgment by Lile. Nowhere in the deposition evidence is there any rebuttal to the uncontradicted summary judgment evidence of the Heldenfels Brothers supervisors that *they alone* (Heldenfels) were in control of the vehicle and driver in question after it came onto the job site. The *only autonomy* left for the driver was to place the truck in gear and pull forward when told by an employer of Heldenfels to do so. The majority does not set out any facts in their opinion that raise any questions as to who was in control of the driver after he reached the barricaded area. A question of fact simply does not exist.

In my opinion, the summary judgment evidence established as a matter of law that Hernandez was a "borrowed servant"

of Heldenfels at the time of the accident. The trial judge properly and correctly rendered summary judgment for Charlie Lile, individually and d/b/a Raven Transport and Raven Supply. I would overrule the second point of error presented by the Laras, and would affirm the judgment of the trial court.