NUMBER 13-02-450-CV

 

COURT OF APPEALS

 

THIRTEENTH DISTRICT OF
TEXAS

 

CORPUS CHRISTI - EDINBURG

 

 

 

WESTERN STEEL COMPANY, INC.,                                               Appellant,

 

                                                             v.

 

HANK ALTENBURG,                                                                         Appellee.

 

 

 

   On appeal from the 347th
District Court of Nueces County, Texas.

 

 

 

                                 DISSENTING OPINION

 

                          Before Justices Yañez, Castillo,
and Garza

                             Dissenting Opinion by Justice Castillo

 








I respectfully dissent.  The jury below found appellant, Western Steel
Company, Inc., negligent for injuries sustained by appellee, Hank Altenburg, in
an industrial accident.  The jury also
found that Altenburg was not a Aborrowed employee@ of Western Steel.[1]  In two issues, Western Steel asserts that the
evidence was legally and factually insufficient to support the jury's finding
that Altenburg was not a borrowed employee. 
For the reasons explained below, I would reverse and remand for further
proceedings. 

I. 
BACKGROUND








            Western
Steel fabricates structural steel columns, 
beams,  stairs,  and other large steel items used in
industrial buildings.  From time to time,
it retains the services of temporary employees. 
Unique Employment Services placed Altenburg as a temporary employee with
Western Steel, as a fitter=s helper. 
His job was to camber steel I-beams.[2]  Altenburg 
sustained a crush injury to his foot on his first day at the job site,
September 14, 1998, when an I-beam fell.[3]  He sued Western Steel on several negligence
theories.  Western Steel asserted
affirmative defenses, including that all claims were barred based on the
borrowed servant doctrine.

Evidence
reflected that a line of twenty to thirty I-beams was in place when Altenburg
arrived.  Altenburg was instructed in the
cambering process, worked on one beam, and began work on a second one.  As he heated the middle of the beam, it
dropped and rolled.  In a domino effect,
the beam caused the others to fall. 
Before Altenburg realized what was happening, one of the beams fell
across his foot.  

After
contacting Unique to determine where to take Altenburg for treatment, a Western
Steel employee took him to a local clinic. 
Altenburg filed a workers' compensation claim through Unique and
received benefits thereunder. 
Thereafter, Altenburg filed suit against Western Steel.  At trial, various additional evidence was
tendered on the issue of who had the right to control Altenburg=s work.








Upon the
conclusion of Altenburg's case-in-chief, Western Steel moved for a directed
verdict on grounds that its borrowed servant defense was conclusively
established.  At the closing of all
evidence, Western Steel also moved for an instructed verdict, asserting the
borrowed servant defense.  Both motions
were denied.  The jury found that
Altenburg was not a borrowed employee, found Western Steel negligent, and awarded
damages.  The trial court entered a final
judgment reflecting the jury award. 
Western Steel filed a motion for new 
trial, which was overruled by operation of law.  This appeal ensued. 

II.  ISSUES PRESENTED

In its
first issue, Western Steel argues the evidence is legally insufficient to
support the jury's finding that Altenburg was not a borrowed employee.  Western Steel contends that the evidence
submitted at trial reflected the following: (1) it provided Altenburg all the
necessary tools, equipment, and materials to perform his work; (2) it had the
exclusive right to direct and control Altenburg's work at all times; (3) Unique
relied upon Western Steel to supervise, direct, and control all of Altenburg's
work activities while at Western Steel's shop; and (4) Unique had no input into
how Altenburg performed his work for Western Steel.   

Western
Steel also argues in its second issue that the evidence was factually
insufficient to support the jury's answer to Question Number 5.[4]








III.  STANDARDS OF REVIEW

A.
Legal Sufficiency

We
address legal‑sufficiency challenges as either "no‑evidence"
or "matter‑of‑law" issues.  Gooch v. Am. Sling Co., 902 S.W.2d
181, 183‑84 (Tex. App.B Fort Worth 1995, no writ).  We analyze the issue as a "no‑evidence"
challenge when the party complaining on appeal did not bear the burden of proof
at trial.  Id.  Where the appellant did not bear the
burden of proof on the issue, he must show that the record presents no evidence
to support the adverse finding.  Croucher
v. Croucher, 660 S.W.2d 55, 58 (Tex. 1983). 


Where, as
here, the appellant bears the burden of proof on the issue, review must be
addressed as a  "matter‑of‑law"
challenge.  Dow Chem. Co. v. Francis,
46 S.W.3d 237, 241 (Tex. 2001).  If, in
reviewing a "matter‑of‑law" challenge, we conclude that
the record presents no evidence to support the finding, we then examine the
entire record to determine if a contrary proposition is established as a matter
of law.  Id.;  Holley v. Watts, 629 S.W.2d 694, 696
(Tex. 1982).

In
performing a legal-sufficiency review, we consider only the probative evidence
and inferences that support the challenged finding, disregarding all evidence
and inferences to the contrary.  Lenz
v. Lenz, 79 S.W.3d 10, 19 (Tex. 2002). 
We overrule a legal-sufficiency challenge if the record reflects any
evidence of probative force to support the finding.  ACS Investors, Inc. v. McLaughlin, 943
S.W.2d 426, 430 (Tex.1997).  








If there
is more than a scintilla of evidence to support the finding, the legal‑sufficiency
challenge fails.   Formosa Plastics
Corp. v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 48 (Tex.
1998).  The evidence is no more than a
scintilla and, in legal effect, is no evidence "[w]hen the evidence
offered to prove a vital fact is so weak as to do no more than create a mere
surmise or suspicion of its existence." 
Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983).  Suspicion linked to other suspicion produces
only more suspicion, not some evidence.  Marathon
Corp. v. Pitzner, 106 S.W.3d 724, 727 (Tex. 2003); Browning‑Ferris,
Inc. v. Reyna, 865 S.W.2d 925, 928 (Tex. 1993).  Similarly, an inference stacked only on other
inferences is not legally sufficient evidence. 
Pitzner, 106 S.W.3d at 727. 
Conversely, more than a scintilla exists when the evidence "rises
to a level that would enable reasonable and fair‑minded people to differ
in their conclusions."  Transp.
Ins. Co. v. Moriel, 879 S.W.2d 10, 25 (Tex. 1994). 

When both
legal and factual sufficiency challenges are raised on appeal,  the court must first examine the legal
sufficiency of the evidence.  See
Glover v. Texas Gen. Indem. Co., 619 S.W.2d 400, 401 (Tex. 1981) (per
curiam). 

B.  Factual Sufficiency

When reviewing a
jury verdict to determine the factual sufficiency of the evidence,  the party attacking a finding on which an
adverse party bore the burden of proof must show that the record presents Ainsufficient evidence@ to
support the finding.  Gooch, 902
S.W.2d at 184.  In a factual
insufficiency attack on an adverse finding on which it bore the burden of proof
at trial, a party must show that the finding is against the Agreat weight and preponderance of the evidence.@  Raw Hide
Oil & Gas, 766 S.W.2d at 275.  We
examine and consider all the evidence.  Maritime
Overseas Corp. v. Ellis, 971 S.W.2d 402, 406-07 (Tex. 1998).  We set aside the verdict only if it is so
contrary to the overwhelming weight of the evidence as to be clearly wrong and
unjust.  Pool v. Ford Motor Co., 715
S.W.2d 629, 635 (Tex. 1986). 

 








IV. 
LEGAL SUFFICIENCY ANALYSIS

In its first issue, Western Steel argues it
established the borrowed servant defense as a matter of law.  Specifically, Western Steel argues that it
had the right to direct and control Altenburg's activities with respect to the
cambering process and that it controlled all other aspects of Altenburg's work
at all times while he was working on Western Steel's premises.   Altenburg responds that the testimony relied
upon by Western Steel to establish direction and control instead only reflects
pre-work direction by Western Steel's employees.   We must examine the record to determine
whether some evidence exists to support the finding in issue, namely, that
Altenburg was not a borrowed servant of Western Steel.  See Weirich v. Weirich, 833 S.W.2d 942,
945 (Tex. 1992).   

A. 
Borrowed Servant Defense








 The supreme court has long recognized that a
general or regular employee of one employer may become the borrowed employee of
another with respect to some activities. 
St. Joseph Hosp. v. Wolff, 94 S.W.3d 513, 537 (Tex. 2002); J.A.
Robinson & Sons, Inc. v. Wigart, 431 S.W.2d 327, 330 (Tex. 1968); see
also Wingfoot Enter. v. Alvarado, 111 S.W.3d 134, 146 (Tex. 2003); Sparger
v. Worley Hosp., Inc., 547 S.W.2d 582, 583 (Tex. 1977).   Whether an individual has become a borrowed
employee of another hinges on whether the other employer or its agents have the
right to direct and control the employee with respect to the details of the
particular work at issue.  Wolff,
94 S.W.3d at 537.  If the general
employee is placed under the control of a special employer in the course of
performing a particular service, he becomes a borrowed employee of the special
employer.[5]  Miller v. Hood, 536 S.W.2d 278, 282
(Tex. App.BCorpus Christi 1976, writ ref'd n.r.e.).  However, if the employee remains under the
control of his general employer while performing such service, he remains the
employee of the general employer.  Id.


If an
employee of one employer becomes the borrowed employee of another, he is no
longer considered an employee of the general employer for vicarious liability
purposes.  Wolff, 94 S.W.3d. at
538. The instruction in the Texas Pattern Jury Charge generally summarizes the
principle:

An employee ceases to be an employee of his
general employer if he becomes the "borrowed employee" of
another.  One who would otherwise be in
the general employment of one employer is a borrowed employee of another employer
if such other employer or his agents have the right to direct and control the
details of the particular work inquired about. 

 

Id. (citing Texas
Pattern Jury Charges B Malpractice, Premises Products, PJC 52.2 (1997)).  

The
borrowed servant doctrine is discussed in Restatement
(Second) of Agency _227 (1958), "Servant Lent to Another
Master."   See Lara v. Lile,
828 S.W.2d 536, 538 (Tex. App.BCorpus Christi 1992, writ denied).  Section 227(b) states that: 

. . . in the absence of evidence to the
contrary, there is an inference that the actor remains in his general
employment so long as, by the service rendered another, he is performing the
business entrusted to him by the general employer.  There is no inference that because the
general employer has permitted a division of control, he has surrendered
it.  

 

Lile, 828 S.W.2d at 538.  The question is which employer has the right
of control over the actions of the employee. 
Id.  








Examples of the
type of control an employer normally exercises include when and where to begin
and stop work, the regularity of hours, the amount of time spent on particular
aspects of work, the tools and appliances used to perform the work, and the
physical method or manner of accomplishing the end result.  See Thompson v. Travelers Indem. Co. of Rhode
Island, 789 S.W.2d 277, 278-79 (Tex. 1990).  The
right of control is necessarily determined as an inference from facts and
circumstances such as the following:  (1)
the nature of the general project; (2) the nature of the work to be performed
by the machinery and employees furnished; (3) length of the special employment;
(4)  the type of machinery furnished; (5)
acts representing an exercise of actual control; and (6) the right to
substitute another operator of the machine, etc. See Producers Chem. Co. v.
McKay,  366 S.W.2d 220, 226 (Tex.
1963).  We must carefully distinguish
between authoritative direction and control, and mere suggestion as to details
or necessary cooperation, where the work furnished is part of a larger
undertaking.  See id.  Directions to a special employee that are
limited to when to start and stop work, in coordination with the other
employees' work on the ultimate project, do not constitute such control over
the employee as to trigger the borrowed servant doctrine.  Id.  
Applicability of the borrowed servant doctrine must be reviewed on a
case-by-case basis.  See Lile, 828
S.W.2d at 540; Aguilar v. Wenglar Const. Co., Inc., 871 S.W.2d 829, 831
(Tex. App.BCorpus Christi 1994, no pet.).   

The
borrowed servant doctrine is an inferential rebuttal defense to tort liability
based upon respondeat superior. Linden-Alimak, Inc. v. McDonald, 745
S.W.2d 82, 84 Tex. App.BFort Worth 1988, writ denied) (citing Select
Ins. Co. v. Boucher, 561 S.W.2d 474, 477 (Tex.  1978)). 
Western Steel bore the burden of proof on this question, see Quantum
Chem Corp. v. Toennies, 47 S.W.3d 473, 481 (Tex. 2001), which was rejected
by the jury.  Western Steel therefore
bears the burden to establish that Altenburg was its borrowed servant when he
sustained an injury.  Dow Chem. Co.,
46 S.W.3d at 241.

 








B.  Was There More Than a Scintilla of Evidence
to Support the Jury=s Finding?

In
reviewing the record for evidence supporting the jury's finding, we turn to Altenburg's
argument that the evidence establishes that Western Steel provided only
pre-work direction, and the evidence was therefore insufficient to prove that
Unique surrendered its right to control. 
Altenburg directs us to evidence that he contends shows  (1) he was paid as an employee of Unique, (2)
he brought his own required hand tools, safety equipment and gloves, (3) at the
time of his injury he was providing welding services that did not require
specific instruction, (4) he was not under the direct supervision of any
Western Steel employee at the time of his injury, (5) the lack of safety
equipment which caused the injury was Western Steel's safety equipmentBthe failure to utilize jack stands with
stops, (6) the correction of this defect was made by Western Steel, not Unique,
after his injury and because of his injury, (7) Unique, not Western Steel, paid
for his workers' compensation benefits, and (8) there was no written contract
which changed his employment status.  I
have examined the record  for evidence
that supports the jury's finding, while ignoring all evidence to the
contrary.  See Lenz, 79 S.W.3d at
19.             

Altenburg
asserts he took his own tools, safety equipment, and gloves.  The record, including Altenburg=s own testimony, establishes only that he
provided his own steel-toed boots.   

Altenburg
points to evidence showing that he was not under the direct supervision of any
Western Steel employee at the time of his injury.  Altenburg testified that he was working on
another project when a Western Steel supervisor told him he was needed on a
"special project" and led him to the newly-assigned work area.  








Altenburg
asserts that, at the time of his injury, he was providing welding services that
did not require specific instruction.  He
argues that the input provided by Western Steel supervisors  constituted Apre-work direction@ rather than control over the details of the
work he was performing.  He testified
that (1) he was not a welder, (2)  prior
to working at Western Steel, he had not cambered beams, and (3) a Western Steel
supervisor trained him as to how to camber a beam on a machine prior to the
additional training of cambering beams with the welding wand.  Altenburg also testified that the Western
Steel supervisor explained and demonstrated the cambering process, then had
Altenburg start cambering.  Altenburg
testified that the supervisor remained there while Altenburg finished cambering
the first beam to review and ensure that Altenburg=s technique was proper.  The supervisor directed him on which beams to
camber first and how to progress. 

Altenburg
also asserts that certain safety equipment was missing prior to the accident
and that Western Steel made corrections to this Adefect@ after the accident.  However, this evidence does not bear on
whether Western Steel had or exercised the right to control Altenburg=s work. 
See Producers Chem, 366 S.W.2d at 226.  

Ray
Robles, Unique=s industrial division manager, agreed that
Unique did not contact Western Steel to advise or alter the manner in which
Western Steel instructed Altenburg in cambering the beams.  Further, Unique did not advise or instruct
Western Steel to provide better and safer equipment and instructions.








Robles
also testified that while Altenburg was Unique's paid employee,  Western Steel 
paid Unique $6.00 an hour for work Altenburg performed for Western
Steel.  Michael Yankee, Western Steel's
president, testified that the company paid an invoice to Unique and received,
as the result, an income tax deduction "the same as paying a payroll
check."  None of this evidence
establishes that Unique retained the right to control the nature or performance
of the work.  See Wingfoot, 111
S.W.3d at 143-44.[6]








Altenburg
also asserts that he was not a borrowed employee of Western Steel because
Unique paid his workers' compensation benefits and that this factor supports
the jury's finding.  The record does not
establish whether Unique is a "staff leasing services company" as
defined and regulated by the Staff Leasing Services Act (the
"SLSA").  See Tex. Lab. Code Ann. _91.001B.063 (Vernon 1996 & Supp. 2004-05).  Generally, courts determine whether a
workers' compensation insurance policy covers a worker's injury by determining
whether the subscribing company is the worker's employer under the right‑of‑control
test.  See Thompson, 789
S.W.2d at 278.  However, the SLSA
expressly provides that a staff leasing company maintains "the right of
direction and control" over  leased
employees for a variety of purposes, including workers' compensation
benefits.  See  Tex.
Lab. Code Ann. ' 91.032 (Vernon Supp. 2004-05).  The SLSA grants the staff leasing company the
exclusive right to elect or deny workers' compensation coverage to leased
workers.  See id., ' 91.042(b), (c) (Vernon 1996).  Thus, the SLSA, where applicable, statutorily
supersedes the common law right‑of‑control test in determining
employer status of leased employees for workers' compensation coverage purposes
only.  Tex. Workers' Comp. Ins. Fund
v. Del Indus., Inc., 35 S.W.3d 591, 596 (Tex. 2000).  

Finally,
Altenburg asserts that no written contract changed his employment status.  Robles testified that Unique and Western
Steel had a written contract, though it was not admitted in evidence.  However, the Supreme Court has recently
affirmed that contractual designation of control will not establish borrowed
servant status as a matter of law where evidence shows that the parties acted
to the contrary.  Wolff, 94 S.W.3d
at 544 n.92.  Considering the probative
evidence and inferences, Altenburg's argument based on the contract must fail
as a matter of law.  

On this
record, I am unable to conclude that there is legally insufficient evidence of
probative force to sustain the jury=s finding. 
Pitzner, 106 S.W.3d at 727; Producer=s Chem., 336 S.W.2d at 226.       

C. 
Does the evidence establish the opposite of the jury=s finding?

 








Because Western Steel bore the burden of
proof on the borrowed servant defense, we look to the circumstances surrounding
Altenburg's temporary employment with Western Steel by reviewing the factors
enumerated in McKay, 366 S.W.2d at 226.  For this legal sufficiency analysis, I
examine the record to determine if a proposition contrary to the jury=s finding (i.e., that Altenburg was a
borrowed servant of Western Steel) is established as a matter of law.  Watts, 629 S.W.2d at 696.   

1. 
The nature of the general project

Charles Johnson, a Western Steel shop
foreman, testified that part of his job involved securing temporary
workers.  Altenburg had previously worked
at Western Steel as a general helper, through Unique's competitor, and had used
a welding torch.  This particular project
assigned to Altenburg involved cambering twenty or thirty beams and  was part of a larger project, namely,
building trusses which included cambered members.  Altenburg had been working on one task and
was directed to move to another aspect of the larger project which involved the
cambering of the beams. Johnson testified that Altenburg would be working by
himself and was expected to work until he finished the beams.  Hedtke, another shop foreman, testified to
these same facts. He also related that, 
after Altenburg was instructed on how and where to perform the work,
Altenburg worked on one beam, under the direction of the supervisor, before
beginning work on a second beam.  Then,
the incident which caused the injury occurred. 

2. 
The nature of the work to be performed by

the machinery and employees furnished

 








Johnson, Hedtke, and Alternburg each
testified that Western Steel provided the welding equipment (the machinery), as
well as the face shield, the welder's apron, and the protective gloves (the
safety equipment) that Altenburg used in performing the work.  Altenburg confirmed that Western Steel
personnel supervised him and provided the employees who instructed and trained
him on how to perform the work.  Hedtke
testified that he had instructed Altenburg on how to camber the beams and made
sure he understood the procedure.  Hedtke
stated that he spent more than two hours with Altenburg, explaining the entire
process to him and showing him what needed to be done.  He instructed Altenburg in the actual
cambering process by demonstrating for at least thirty to forty-five
minutes.  This training included
instruction on how to hold the welding wand, where to stand, when and where to
begin, and how to camber the beams. 
Johnson similarly testified that on the date in question, Altenburg was
in a "training process," but he was not given specific training on
how to weld or use a welding torch. 
Hedtke supervised and directed Altenburg in his work, though he had
stepped a short distance away at the time of the injury.  Altenburg's engineering expert, Dr. Jack
Madeley, testified that Altenburg was not being supervised at the time of his
injury, but he agreed that Western Steel and its agents had the right to direct
and control the details of the cambering process.

3. 
Length of the special employment

Johnson and Hedtke each testified that
cambering twenty to thirty beams would take two to three days. Altenburg
testified that, when he first began working at Western Steel,  he was grinding corners off metal pieces.  He subsequently worked there as a pipe fitter
before receiving the assignment to camber beams. The actual length of the prior
special employment at Western Steel was approximately two months. The length of
the actual work involving cambering beams was approximately two hours, though
the anticipated length of that particular assignment was three days.  

4. 
The type of machinery furnished 








Testimony of several witnesses reflected
that Western Steel provided the welding tools and equipment to camber the
beams, including the torch, gas striker, and winch.  Western Steel provided the materials,
including the beams, four-by-four blocks, and 
welding materials.  Western Steel
also provided safety equipment, including the face shield, welder=s apron, and protective gloves.  

5. 
Acts representing an exercise of actual control

Altenburg testified that a supervisor at
Western Steel told him he was needed in a "special detail" and took
him to the location where steel beams were lined in a row, ready to be
cambered.  He testified that he had no
prior training on how to camber a beam on the floor, but he had been trained to
camber a beam on a machine.  The supervisor
demonstrated the cambering process on the first beam and then handed Altenburg
the welding torch to finish it. 
Altenburg began cambering that beam, with the supervisor watching to
ensure his technique was good because, as Altenburg testified, "it's a
little tricky."  Altenburg further
testified that, after he completed the first beam, the supervisor said,
"Just go ahead and, you know, you're on your own . . . .  I'll come by and check you every now and
then, to make sure everything's all right."  Altenburg testified that the supervisor
directed him to start on the beams lined up in the back and to move from back
to front, instead of from front to back. 
He explained, "So, instead of being postured like that, I'd be
slumped over quite a bit, trying to make an effort to reach that last beam . .
. .  It was a little awkward."  Altenburg 
testified that the beam he cambered by himself was the one that tipped
over and landed on his foot.  Hedtke
testified that shortly after he walked away from Altenburg, he heard the beam
fall, and he returned to the scene where he saw Altenburg holding his foot. 








Altenburg=s testimony further addressed the control
issue.  He agreed that Western Steel told
him what time to appear and where to go, and that Western Steel controlled and
directed (1) when he was to be at work each day, (2) when he could take breaks,
(3) his quitting time, (4) the number of hours he could work, (5) his
activities while he was a temporary worker on the premises, and (6) how and in
what manner and sequence to perform the cambering process on the beams.  He further confirmed Western Steel first
instructed and then supervised him in the cambering process, directed and
controlled his performance of that process, and provided the tools, welding
equipment, and safety equipment to be used in that process. He testified that
Western Steel could modify the work he performed and had the right to terminate
his employment.

Johnson testified that Western Steel used
temporary employees because, "It's a good way to find qualified help in a
shop.  And . . . we just need temporary
help because of the different types of jobs that come around."  Although he had the opportunity to hire
Altenburg as "a full-time employee," he did not hire him as one;
rather, Johnson referred Altenburg to Unique "to get them to hire him and
send him to Western Steel."  Johnson
testified that no one from Unique attempted to direct and control the
activities of the temporaries or the cambering process, and this control at all
times remained the exclusive right of Western Steel.   He further testified that Western Steel
supervisors had the right to direct and control the details of the work of the
temporary employees.








Robles testified that his duties with Unique
were to oversee the placement coordinators who interviewed all employees sent
to clients.  Unique worked to match the
skills of its client employees to the needs of its client companies.  He agreed Unique loaned its temporary
employees to companies like Western Steel to perform work for those companies.  Robles testified that Altenburg was employed
with Unique during the last quarter of 1998, Western Steel was Unique's client
in September 1998, and Unique sent Altenburg to Western Steel.  

Robles further testified that the client
company, Western Steel, had the right to direct and control the details of the
activities performed by Unique=s Aclient employees@ such as Altenburg.  He testified that Unique had no right to and
never attempted to go onto Western Steel's property and control or direct the
work that Altenburg was performing. 
Unique had no right to tell Altenburg when to report for work at Western
Steel, when to take his breaks, how long he would work for Western Steel, or
the days he would work.  Unique did not
provide any of the tools, equipment, or materials utilized by Altenburg on the
job.  Robles further testified that
Western Steel had the right to direct and control not only Altenburg's work,
but also the work of all other employees Unique sent to Western Steel.  Unique relied upon its client companies such
as Western Steel to supervise any Unique employees working at their job
site.  He specifically testified that Ait was an understanding that the client
company, being Western Steel, would direct Mr. B or any of our employees out there as to
what their work would be and what time they would show up and what hours they
would work.@ 
Robles further testified that Unique 

. . . had no B no B no control over that.  I mean, as far as controlling his activities,
that was left entirely up to the supervisor since he was the one that knew how
the job needed to be done and what needed to be done.  So it was the supervisor's responsibility to
let Mr. Altenburg know exactly what needed to be done, where he needed to be
placed and everything.[7]  

 

The supervisors referenced were AWestern Steel supervisors.@








Unique and Western
Steel had a contract between them which governed their relationship.[8]  Robles testified that AWestern Steel in fact, paid Unique to have
Mr. Altenburg work over there, and out of that pay, they madeBthere were payments made for his salary to
Mr. Altenburg.@ 

Madeley, Altenburg's
engineering expert, also testified that Western Steel and its agents had the
right to direct and control the details of the cambering process.  Altenburg, when asked whether he considered
himself a Western Steel employee, answered: 
"I knew that I was sent there by Unique Temporary Services.  They were my paid employer."  However, he further testified, as noted
above, that all aspects of the work were directed and controlled by Western
Steel. 

The accident
occurred after Altenburg was instructed in the cambering process and worked
alone for a short time.  The supervisor
left but was to check on Altenburg "now and then, to make sure
everything's all right."  Altenburg
testified that he would have followed any instruction, direction and control
given to him by the Western Steel supervisor because Aduring the time that [he] was injured, he
[the supervisor] had the right to direct and control [Altenburg=s] work.@

The evidence
establishes that Western Steel maintained the right to direct and control the
details of the particular work, namely, the cambering process.  

V.  FACTUAL SUFFICIENCY ANALYSIS








Determining whether
the evidence at trial was factually insufficient to support the jury=s finding, such that the finding is against
the great weight and preponderance of the evidence as to be manifestly unjust,
similarly requires a review of the entire record.  Pool
v. Ford Motor Co., 715
S.W.2d at 635.  The same facts reviewed
to determine whether or not Western Steel=s borrowed servant defense was established as a
matter of law have been reviewed to determine whether the evidence was
factually sufficient to support the jury=s finding that Altenburg was not a borrowed
servant.  Id. 

Evidence shows that
Western Steel had the right to direct and control the details of Altenburg's
work, Unique did not control the work performed, and Unique did not go out to
direct the activities while Altenburg was at Western Steel.  Further, Unique (1) did not and had no right
to tell Altenburg when to report to work, (2) had no right to direct or control
the length of Altenburg=s employment or the days he would work, (3)
did not provide the tools or equipment, including safety equipment, that
Altenburg used, (4) did not instruct, train, or supervise Altenburg in the task
at hand, and (5) did not direct Altenburg as to when, where, or how to perform
the work.  The evidence establishes that
Western Steel had the right to direct and control Altenburg=s work at all times, and Unique relied on
Western Steel=s supervisors to direct and control all
aspects of the work.








Rather than a mere
suggestion as to details or necessary cooperation, Western Steel provided Aexactly the type of direction and control
contemplated by the doctrine of borrowed servant.@  Wenglar,
871 S.W.2d at 832 (finding that basic guidance in how to complete a specific
task, including where to stand and how to physically accomplish the work,
supported a finding that the employee was a borrowed servant); see also
Exxon Corp. v. Perez, 842 S.W.2d 629, 630 n.2 (Tex. 1992) (per
curiam).  I conclude that Western Steel
had the right to, and did, direct and control the details of Altenburg's work
in the manner contemplated by the borrowed servant doctrine, thus placing
Altenburg temporarily under the Aemploy@ of Western Steel for purposes of its
responsibility for his conduct and for his safety in performing the work.  

However, the Texas
Supreme Court in Garza v. Exel Logistics, Inc., No. 02-1187, 2005 Tex.
LEXIS 297, at *19-*21 (Tex. April 8, 2005) (designated for publication)
recently held that the determination of control over the individual=s work is not itself dispositive of the
issue of whether a special employer is entitled to assert the exclusive remedy
bar under the workers= compensation statute. 

VII.  DISPOSITION

In summary, after
conducting the analysis applying the factors in McKay, I conclude that
not more than a scintilla of evidence existed to support the jury=s finding on the borrowed servant issue, an
issue on which Western Steel bore the burden of proof.  Under the second prong of the legal
sufficiency analysis, review of the entire record was required to determine
whether the opposite of the jury=s finding was established as a matter of
law.  Similarly the factual sufficiency
analysis required review of the entire record to determine if the jury=s finding was so against the great weight
and preponderance of the evidence as to be manifestly unjust. 

Respectfully, I
would sustain Western Steel=s first issue on appeal, that the evidence
was legally insufficient to support the jury=s finding, and that the evidence as to
borrowed servant, a defense on which Western Steel bore the burden of proof,
conclusively established the opposite of the jury=s finding. 
I conclude the evidence established that Altenburg was a borrowed
employee of Western Steel as a matter of law.  
I would similarly sustain Western Steel=s second issue on appeal, that the evidence
was factually insufficient to support the jury=s finding, because that finding was against
the great weight and preponderance of the evidence.    








We normally reverse
and render when we sustain a legal sufficiency issue on appeal. Vista
Chevrolet, Inc. v. Lewis, 709 S.W.2d 176, 177 (Tex.1986) (per curiam).  However, because the parties did not have the
benefit of the recent Texas Supreme Court decision in Garza, I would
remand  to the trial court for further
proceedings consistent with that opinion. 
Garza, 2005 Tex. LEXIS 297 at *19-*21.  

VIII.  CONCLUSION

The issue on appeal
focuses on the jury=s answer to question 5, whether Altenburg was
a borrowed servant.   I would sustain
Western Steel=s first issue on appeal  on the sole question before us of borrowed
servant.  I would reverse.  In light of Garza, I would remand for
further consideration by the trial court as to whether or not Western Steel,
even if Alternburg were its borrowed servant, adequately tendered evidence
entitling it to claim protection under the workers= compensation exclusive remedy bar.  Tex. R.
App. P. 43.2 and 43.3(a).                                                              

ERRLINDA CASTILLO

Justice

 

Dissenting Opinion delivered and filed

this 23rd day of June, 2005.

 

 











[1]  The jury answered seven questions,
as follows (instructions are not included):

 

Question No. 1: 
Did the negligence, if any of Western Steel Company, Inc. proximately
cause the occurrence or injury in question?

Answer:  Yes.

 

Question No. 2: 
Was the Aproduct upon which the I-beams were
placed@ at the time of the occurrence or
injury in question released into the stream of commerce by Western Steel
Company, Inc?

Answer: 
No.

 

Question No. 3 [to be answered only if the jury
answered AYes@ to Question No. 2]:  Was there a design defect in the Aproduct upon which the I-beams were
placed@ at the time it was released into
the stream of commerce by Western Steel Company, Inc., for the use of Hank
Altenburg that was a producing cause of the occurrence or injury in question?

Answer: 
N/A.

 

Question No. 4: 
What sum of money, if paid now in cash, would fairly and reasonably
compensate Hank Altenburg for his injuries, if any, resulting from the
occurrence in question?

Answer: 
[total] $65,500

 

Question No. 5: 
On the occasion in question was Hank Altenburg acting as a borrowed
employee of Western Steel Company, Inc.?

Answer: 
No.

 

Question No. 6 [to be answered only if the jury
answered AYes@ to Question No. 1 or 3]:  Do you find by clear and convincing evidence
that the harm to Hank Altenburg resulted from malice?

Answer: 
No.

 

Question No. 7 [to be answered only if the jury
answered AYes@ to Question No. 6]:  Do you find by clear and convincing evidence
that the conduct of Western Steel Company, Inc. knowingly or intentionally
caused serious bodily injury to Hank Altenburg?

Answer:  N/A.





[2] 
Cambering involves heating a steel beam in excess of 250 pounds to cause
it to bend in the middle.  The beams in
issue were elevated on both ends by four-by-four wooden blocks, and heat was
applied to the middle by using a welding wand with a rosebud-tip torch.  This process caused the middle of the beams
to droop, resulting in the desired bend. 
Each beam was twelve inches tall and twenty-five feet long.  A crane was used to put the beams in
place.  





[3]  Altenburg suffered three broken toes and a stress fracture
which required corrective surgery.





[4] Question number five in its
entirety read as follows:   

 

On the occasion in question was
Hank Altenburg acting as a borrowed employee of Western Steel Company, Inc.?

 

An Aemployee@ is a person in the service of
another with the understanding, express or implied, that such other person has
the right to direct the details of the work and not merely the result to be
accomplished.

 

An employee ceases to be an
employee of his general employer if he becomes the Aborrowed employee@ of another.  One who would otherwise be in the general
employment of one employer is a borrowed employee of another employer if such
other employer or his agents have the right to direct and control the details
of the particular work inquired about.

 

Answer AYes@ or ANo.@

 

Answer:   No.

 





[5]  In this opinion, the term Ageneral employer@ is used to refer to the provider
of temporary workers that employs a worker (Ageneral employee@) who is then assigned to work for a client of the provider,
the Aspecial employer.@  See Wingfoot Enter. v. Alvarado, 111
S.W.3d 134, 137 (Tex. 2003).  





[6]  The fact that workers= compensation coverage was
provided by Unique does not alter our need to determine who retained the Aright to control@ Altenburg=s work.  See Wingfoot Enter. v. Alvarado, 111
S.W.3d 134, 144 n.56 (Tex. 2003) (citing Rodriguez v. Martin Landscape Mgmt.
Inc., 882 S.W.2d 602, 605-06 (Tex. App.BHouston [1st Dist.] 1994, no writ) and Denison
v. Haeber Roofing Co., 767 S.W.2d 862, 864-65 (Tex. App.BCorpus Christi 1989, no
writ) (each holding that there was a fact question about whether the client
company had a right to control employee and therefore whether it could assert
exclusive remedy provision based on workers= compensation policy obtained by general employer
who supplied contract labor)); see also Pedersen v. Apple Corrugated
Packaging, Inc., 874 S.W.2d 135, 137-38 (Tex. App.BEastland 1994, writ denied)
(holding the client company who controlled details of an employee=s work at time of injury
was an employer for purposes of the exclusive remedy bar, even though a leasing
company carried the employee on its workers= compensation policy and the leasing company was
the insured rather than the client).  I
note the analysis of the Texas Supreme Court:

 

These purposes of the
[Workers= Compensation] Act are
carried out by recognizing that the express definition of Aemployer@ and Aemployee@ and the exclusive remedy
provision may apply to more than one employer. 
An employee in Alvarado=s situation will be working
for her general employer (i.e., the temporary staffing provider), but
will also be subjected to laboring in the workplace and under the direction of
the general employers= client company. . . . An
employee injured while working under the direct supervision of a client company
is conducting the business of both the general employer and that employer=s client.  The employee should be able to pursue workers= compensation benefits from
either. . . . The purposes underlying the Workers= Compensation Act and its
definition of Aemployer@ and Aemployee@ indicate that the general
employer is, and should be, an Aemployer@ of a temporary worker even
if a client company directs the details of that employee=s work when the employee is
injured.

 

Wingfoot, 111 S.W.3d at 142-43.  But see Garza v. Exel Logistics, Inc., No.
02-1187, 2005 Tex. LEXIS 297, at *19-22 (Tex. April 8,  2005) (designated for publication) (finding
that the issue of control over the individual=s work is not the sole
consideration in determining entitlement to the workers= compensation exclusive
remedy bar).    

 





[7]  On cross-examination,  Robles admitted he had no personal knowledge
of facts to show that Altenburg, at the time of his injury, was under the
specific control of any supervisor or person from Western Steel.  





[8] 
As previously noted, the contract between Western Steel and Unique was
not part of the evidence below.