**WESTERN STEEL COMPANY, INC., Appellant,**

v.

**Hank ALTENBURG, Appellee.**

No. 13–02–450–CV.

Court of Appeals of Texas, Corpus Christi–Edinburg.

June 23, 2005.

Rehearing Overruled Aug. 25, 2005.

Marc J. Wojciechowski, Wojciechowski & Associates, Houston, for appellant.

William J. Tinning, Portland, for appellee.

Before Justices YAÑEZ, CASTILLO, and GARZA.

## OPINION

Opinion by Justice YAÑEZ.

Appellee, Hank Altenburg, sued appellant, Western Steel Company, Inc. ("Western"), for injuries sustained in a work-related accident. Following a jury trial, the jury found (1) Western was negligent; (2) Altenburg was not Western's borrowed employee; and (3) that Altenburg was entitled to $88,313.85 in damages. By two issues, Western challenges the legal and factual sufficiency of the evidence support-ing the jury's finding that Altenburg was not its borrowed employee. We affirm.

## Background

On September 14, 1998, Altenburg suffered a work-related injury to his foot while heating steel beams at Western's structural steel shop. At the time of the accident, Altenburg was a temporary worker employed by Unique Employment Services ("Unique") and had been sent by Unique to work in Western's shop. Altenburg was covered by and received benefits under Unique's worker's compensation policy.

Altenburg sued Western, asserting negligence and gross negligence related to the accident. Western asserted various defenses, including the affirmative defense that it was not liable because Altenburg's claims were barred by the worker's compensation bar under the borrowed servant doctrine.

Western filed a motion for summary judgment asserting that it is not liable for negligence based on the exclusive remedy provision of the worker's compensation statute.[1] Western's motion asserted that "Texas courts have afforded the temporary employer the protection of the workers' compensation law, if the temporary employer is a subscriber to workers' compensation insurance, by applying the borrowed servant doctrine." Altenburg's response to the motion is not included in the record. The trial court denied Western's motion.

As noted, the jury found Western negligent, determined that Altenburg was not Western's borrowed employee, and awarded him $88,313.85 in damages.

By two issues, Western appeals the legal and factual sufficiency of the jury's finding that Altenburg was not its borrowed employee. In its brief, Western asserts that

---

1. See TEX. LAB.CODE ANN. § 408.001 (Vernon 1996).

because "[Altenburg] was [Western's] borrowed employee, [Western] is immune from liability by the worker's compensation bar and [Altenburg] should take nothing from [Western]."

## Standard of Review

If, as here, an appellant is attacking the legal sufficiency of an adverse answer to an issue on which he had the burden of proof, the appellant must overcome two hurdles.[2] First, the record must be examined for evidence that supports the finding, while ignoring all evidence to the contrary.[3] Second, if there is no evidence to support the finding, then the entire record must be examined to see if the contrary proposition is established as a matter of law.[4] The issue should be sustained only if the contrary proposition is conclusively established.[5]

When reviewing the factual sufficiency of evidence, we examine all of the evidence and set aside a finding only if it is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust.[6] A court of appeals must detail the evidence relevant to the issue in consideration, clearly state why the jury's finding is factually insufficient or so against the great weight and preponderance of the evidence as to be manifestly unjust, and state in what regard the con-

trary evidence greatly outweighs the evidence in support of the verdict.[7]

## Applicable Law

Section 408.001 is the exclusive remedy provision of the TWCA. Section 408.001(a) provides as follows:

Recovery of workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance coverage ... against the employer ... for ... a work-related injury sustained by the employee.[8]

An employee is "covered by worker's compensation insurance coverage" if his employer possesses an approved insurance policy covering the payment of worker's compensation benefits to its employees.[9]

■ A temporary employee may have more than one employer for purposes of the TWCA's exclusive remedy provision "when a provider of temporary workers furnishes a worker to a client that controlled the details of the work at the time the worker was injured and there was no agreement between the provider of temporary workers and the client regarding workers' compensation coverage." [10]

■ The exclusive remedy provision of the TWCA is an affirmative defense.[11] Because an employer's status as a sub-

---

2. *Victoria Bank & Trust Co. v. Brady,* 811 S.W.2d 931, 940 (Tex.1991).

3. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 241 (Tex.2001).

4. *Id.*

5. *Id.* at 241–42.

6. *Id.* at 242.

7. *Id.* at 241.

8. Tex. Lab.Code Ann. § 408.001 (Vernon 1996).

9. *Id.* § 401.011(44)(A) (Vernon Supp.2004–05).

10. *Wingfoot Enter. v. Alvarado,* 111 S.W.3d 134, 144 (Tex.2003).

11. *Pierce v. Holiday,* 155 S.W.3d 676, 678 (Tex.App.-Texarkana 2005, no pet.); *Brown Servs., Inc. v. Fairbrother,* 776 S.W.2d 772, 775–76 (Tex.App.-Corpus Christi 1989, writ denied); *see Exxon Corp. v. Perez,* 842 S.W.2d 629, 631 (Tex.1992) (Exxon entitled to question on its affirmative defense because it pled and proved its subscriber status and that Perez was its borrowed servant).

scriber to worker's compensation is an affirmative defense, the duty is on the employer/defendant—not the employee/plaintiff—to plead and prove such facts.[12]

In *Garza v. Exel Logistics, Inc.,* the Texas Supreme Court recently held that under the TWCA, a temporary employment agency cannot obtain worker's compensation insurance for a client company simply by obtaining coverage for itself.[13] The court held that "two employers cannot agree that one workers' compensation policy will name only one employer but cover both."[14] The *Garza* court held that because there was no evidence of explicit insurance coverage for Exel (the client company) in the record, Exel had failed to establish that it was "covered by workers' compensation insurance coverage" for a "work-related injury sustained by the employee," which is a prerequisite to the application of the exclusive remedy provision of the TWCA.[15]

### Analysis

■ In the present case, Western was therefore required to plead and prove: (1) Altenburg was a borrowed servant; (2) he was entitled to worker's compensation benefits; and (3) Western had worker's compensation insurance that covered claims asserted by borrowed servants.[16] Thus, one of Western's essential elements of

proof is that it was "covered by workers' compensation insurance coverage."[17]

■ As noted, Western adequately pled the affirmative defense that Altenburg's claims were barred by the worker's compensation bar under the borrowed servant doctrine. However, Western presented no evidence to the trial court that it was "covered by workers' compensation insurance coverage" under the TWCA and that such coverage would have covered a claim made by Altenburg.

The record reflects that immediately prior to the beginning of trial, outside the presence of the jury, Western objected to its "worker's compensation" insurance policy "coming into evidence to the jury." Western's counsel argued that admitting the policy to the jury would be "duplicious" [*sic*] because the parties had stipulated that "Western Steel has a policy of insurance, but that policy did not provide benefits to the plaintiff." Secondly, Western argued that admission of the policy to the jury was irrelevant because:

> [Western's counsel]: . . . The only relevance to the insurance comp—worker's comp insurance issue under the Borrowed Servant Doctrine is that both the general employer must have comp and the special employer, or the borrowing employer, must have worker's comp. Who paid the comp is really not an issue.

**12.** *See* TEX.R. CIV. P. 94; *Pierce,* 155 S.W.3d at 678; *Brown Servs.,* 776 S.W.2d at 775–76.

**13.** *Garza v. Exel Logistics, Inc.,* 161 S.W.3d 473, 478 (Tex. 2005).

**14.** *Id.* at 479.

**15.** *Id.* at 481.

**16.** *See Univ. of Houston—Clear Lake v. Marsh,* 981 S.W.2d 912, 914 (Tex.App.-Houston [1st Dist.] 1998, no pet.).

**17.** *Johnston Testers v. Rangel,* 435 S.W.2d 927, 930 (Tex.Civ.App.-San Antonio 1968, writ ref'd n.r.e.) (defendant not entitled to issue on its defenses that plaintiff was borrowed servant whose sole remedy was under worker's compensation act because defendant did not prove plaintiff was entitled to worker's compensation benefits or that defendant had worker's compensation insurance).

\* \* \* \*

The only relevance it would have would be to the Court on determining the legal issue of whether or not we have met, at least, the superficial or the preliminary elements of Borrowed Servant, number one, being that both the client company and general employer has [*sic*] comp; two, being there was some exercise of control.

The trial court overruled Western's objection and "Plaintiff's Exhibit 14b," Western's insurance policy, was admitted. We have carefully examined the policy. We conclude it does not establish that Western was "covered by workers' compensation insurance" as required under the exclusive remedy provision of the TWCA.[18]

At trial, Michael Yankee, president of Western, testified on cross-examination as follows:

Q [Altenburg's counsel]: Come on, Mr. Yankee, you know what I'm asking. You give him—you give your straight employees W–2s. You don't give him [Altenburg] a W–2.

A [Yankee]: I don't give him a W–2. No.

Q: You don't keep him on your medical insurance. Mr. Altenburg, isn't, is he, correct?

A: No.

Q: He's not on your 401–K plan.

A: That's true.

Q: He's not on your worker's compensation policy for this injury.

A: That's correct.

18. *See* TEX. LAB.CODE ANN. § 408.001 (Vernon 1996). The only reference in Western's insurance policy regarding worker's compensation is a reference specifically *excluding* such coverage. The policy states, in pertinent part:
2. Exclusions.
This insurance does not apply to:

Q: He wasn't paid benefits by your worker's compensation policy.

A: Not that I know of.

\* \* \* \*

Q: All right, sir. Well, you could certainly agree with me that all those benefits your regular employees get, that we just went through, have not been provided, were not provided and were certainly never intended to be provided to this man, Mr. Altenburg, correct?

A: Those benefits are available to him through the temporary company.

Q: Through Unique?

A: That's correct.

Western also offered the video deposition testimony of Ray Robles, Western's industrial division manager. On cross-examination, Robles testified as follows:

Q [Altenburg's counsel]: To go specifically to Mr. Altenburg, for the day he got hurt back on September 14th, 1998, he was paid wages for that day's work by Unique?

A [Robles]: Correct.

Q: Not by Western Steel, correct?

A: Correct.

Q: He was covered by workers' compensation as an employee, an employee of Unique, correct?

A: Correct.

Q: He was actually paid benefits under that workers' compensation policy of Unique by Unique's compensation carrier, correct?

A: Correct.

. . . .
d. Workers' Compensation and Similar Laws
Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

Q: And he was not paid or claimed to be an employee under the workers' compensation policy of Western Steel, was he?

A: Correct.

Q: We would be in agreement, he was not?

A: Correct.

Q: Because he was an employee—considered an employee under the compensation claim and policy of Unique?

A: Correct.

We conclude that the record contains no evidence that Western was "covered by workers' compensation insurance coverage" as required under the exclusive remedy provision of the TWCA[19] and that such coverage would have covered a claim made by Altenburg.

Even if, as Western urges, we were to determine that the evidence establishes as a matter of law that Altenburg was its borrowed employee, such a determination, without proof that Western was covered by worker's compensation insurance, is immaterial.[20]

We briefly address the dissenting opinion. The dissent would hold that the evidence established as a matter of law that Altenburg was Western's borrowed employee. Thus, the dissent would sustain Western's legal and factual sufficiency challenges and would reverse the trial court's judgment. Rather than render judgment in Western's favor, however, the dissent would remand to the trial court for it to consider, in light of Garza,[21] whether Western established that it is "covered by workers' compensation insurance coverage" within the meaning of the exclusive remedy provision of the Texas Worker's Compensation Act ("TWCA").[22]

The dissent's reliance on Garza, however, for its conclusion that remand is appropriate in this case, is misplaced. In Garza, the trial court granted summary judgment in favor of the temporary employment agency and its client, and the court of appeals affirmed.[23] The supreme court affirmed as to the temporary employment agency, but reversed and remanded as to the client company because the court found the client company had not established it was "covered by workers' compensation insurance coverage" as required to assert the exclusive remedy provision of the TWCA.[24] In contrast, the present case is not before us on a summary judgment. A jury has heard all the evidence presented by Altenburg and Western and has rendered judgment. Accordingly, remand is inappropriate because Western failed to prove an essential element of its affirmative defense—specifically, that it was "covered by workers' compensation insurance coverage—" and is therefore not entitled to a second opportunity to prove its affir-

19. *See* Tex. Lab.Code Ann. § 408.001 (Vernon 1996).

20. *See Moore v. Cotter & Co.*, 726 S.W.2d 237, 240 (Tex.App.-Waco 1987, no writ) (stating that jury's finding that plaintiff was borrowed employee, without proof of coverage by compensation was immaterial because proof that worker's compensation insurance existed is essential element of proof in borrowed servant defense); *Guerrero v. Standard Alloys Mfg. Co.*, 598 S.W.2d 656, 657 (Tex.Civ.App.-Beaumont 1980, writ ref'd n.r.e.) (holding that jury's affirmative finding on borrowed servant issue, without proof of compensation coverage, was "immaterial," where defendant had neither plead nor proved that it had worker's compensation insurance).

21. *See Garza*, 161 S.W.3d 473.

22. *See* Tex. Lab.Code Ann. § 408.001 (Vernon 1996).

23. *Garza*, 161 S.W.3d at 474.

24. *Id.*

mative defense. The dissent simply does not address our holding that Western failed to prove that it is covered by workers' compensation insurance.

We hold that Western failed to prove an essential element of its affirmative defense, specifically, that it is "covered by workers' compensation insurance coverage." Accordingly, we affirm the trial court's judgment.

Dissenting Opinion by Justice
ERRLINDA CASTILLO.

Dissenting Opinion by Justice
CASTILLO.

I respectfully dissent. The jury below found appellant, Western Steel Company, Inc., negligent for injuries sustained by appellee, Hank Altenburg, in an industrial accident. The jury also found that Alten-

burg was not a "borrowed employee" of Western Steel.[1] In two issues, Western Steel asserts that the evidence was legally and factually insufficient to support the jury's finding that Altenburg was not a borrowed employee. For the reasons explained below, I would reverse and remand for further proceedings.

## I. BACKGROUND

Western Steel fabricates structural steel columns, beams, stairs, and other large steel items used in industrial buildings. From time to time, it retains the services of temporary employees. Unique Employment Services placed Altenburg as a temporary employee with Western Steel, as a fitter's helper. His job was to camber steel I-beams.[2] Altenburg sustained a crush injury to his foot on his first day at the job site, September 14, 1998, when an

---

1. The jury answered seven questions, as follows (instructions are not included):

     **Question No. 1:** Did the negligence, if any of Western Steel Company, Inc. proximately cause the occurrence or injury in question?
     **Answer:** Yes.
     **Question No. 2:** Was the "product upon which the I-beams were placed" at the time of the occurrence or injury in question released into the stream of commerce by Western Steel Company, Inc?
     **Answer:** No.
     **Question No. 3** [to be answered only if the jury answered "Yes" to Question No. 2]: Was there a design defect in the "product upon which the I-beams were placed" at the time it was released into the stream of commerce by Western Steel Company, Inc., for the use of Hank Altenburg that was a producing cause of the occurrence or injury in question?
     **Answer:** N/A.
     **Question No. 4:** What sum of money, if paid now in cash, would fairly and reasonably compensate Hank Altenburg for his injuries, if any, resulting from the occurrence in question?
     **Answer:** [total] $65,500
     **Question No. 5:** On the occasion in question was Hank Altenburg acting as a bor-

rowed employee of Western Steel Company, Inc.?
     **Answer:** No.
     **Question No. 6** [to be answered only if the jury answered "Yes" to Question No. 1 or 3]: Do you find by clear and convincing evidence that the harm to Hank Altenburg resulted from malice?
     **Answer:** No.
     **Question No. 7** [to be answered only if the jury answered "Yes" to Question No. 6]: Do you find by clear and convincing evidence that the conduct of Western Steel Company, Inc. knowingly or intentionally caused serious bodily injury to Hank Altenburg?
     **Answer:** N/A.

2. Cambering involves heating a steel beam in excess of 250 pounds to cause it to bend in the middle. The beams in issue were elevated on both ends by four-by-four wooden blocks, and heat was applied to the middle by using a welding wand with a rosebud-tip torch. This process caused the middle of the beams to droop, resulting in the desired bend. Each beam was twelve inches tall and twenty-five feet long. A crane was used to put the beams in place.

I-beam fell.[3] He sued Western Steel on several negligence theories. Western Steel asserted affirmative defenses, including that all claims were barred based on the borrowed servant doctrine.

Evidence reflected that a line of twenty to thirty I-beams was in place when Altenburg arrived. Altenburg was instructed in the cambering process, worked on one beam, and began work on a second one. As he heated the middle of the beam, it dropped and rolled. In a domino effect, the beam caused the others to fall. Before Altenburg realized what was happening, one of the beams fell across his foot.

After contacting Unique to determine where to take Altenburg for treatment, a Western Steel employee took him to a local clinic. Altenburg filed a workers' compensation claim through Unique and received benefits thereunder. Thereafter, Altenburg filed suit against Western Steel. At trial, various additional evidence was tendered on the issue of who had the right to control Altenburg's work.

Upon the conclusion of Altenburg's case-in-chief, Western Steel moved for a directed verdict on grounds that its borrowed servant defense was conclusively established. At the closing of all evidence, Western Steel also moved for an instructed verdict, asserting the borrowed servant defense. Both motions were denied. The jury found that Altenburg was not a bor-

rowed employee, found Western Steel negligent, and awarded damages. The trial court entered a final judgment reflecting the jury award. Western Steel filed a motion for new trial, which was overruled by operation of law. This appeal ensued.

## II. ISSUES PRESENTED

In its first issue, Western Steel argues the evidence is legally insufficient to support the jury's finding that Altenburg was not a borrowed employee. Western Steel contends that the evidence submitted at trial reflected the following: (1) it provided Altenburg all the necessary tools, equipment, and materials to perform his work; (2) it had the exclusive right to direct and control Altenburg's work at all times; (3) Unique relied upon Western Steel to supervise, direct, and control all of Altenburg's work activities while at Western Steel's shop; and (4) Unique had no input into how Altenburg performed his work for Western Steel.

Western Steel also argues in its second issue that the evidence was factually insufficient to support the jury's answer to Question Number 5.[4]

## III. STANDARDS OF REVIEW

### A. Legal Sufficiency

We address legal-sufficiency challenges as either "no-evidence" or "matter-of-law"

---

**3.** Altenburg suffered three broken toes and a stress fracture which required corrective surgery.

**4.** Question number five in its entirety read as follows:

On the occasion in question was Hank Altenburg acting as a borrowed employee of Western Steel Company, Inc.?
    An "employee" is a person in the service of another with the understanding, express or implied, that such other person has the right to direct the details of the

work and not merely the result to be accomplished.
    An employee ceases to be an employee of his general employer if he becomes the "borrowed employee" of another. One who would otherwise be in the general employment of one employer is a borrowed employee of another employer if such other employer or his agents have the right to direct and control the details of the particular work inquired about.
Answer "Yes" or "No."
Answer: No.

issues. *Gooch v. Am. Sling Co.*, 902 S.W.2d 181, 183–84 (Tex.App.-Fort Worth 1995, no writ). We analyze the issue as a "no-evidence" challenge when the party complaining on appeal did not bear the burden of proof at trial. *Id.* Where the appellant did not bear the burden of proof on the issue, he must show that the record presents no evidence to support the adverse finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983).

Where, as here, the appellant bears the burden of proof on the issue, review must be addressed as a "matter-of-law" challenge. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex.2001). If, in reviewing a "matter-of-law" challenge, we conclude that the record presents no evidence to support the finding, we then examine the entire record to determine if a contrary proposition is established as a matter of law. *Id.; Holley v. Watts*, 629 S.W.2d 694, 696 (Tex.1982).

In performing a legal-sufficiency review, we consider only the probative evidence and inferences that support the challenged finding, disregarding all evidence and inferences to the contrary. *Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex.2002). We overrule a legal-sufficiency challenge if the record reflects any evidence of probative force to support the finding. *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997).

If there is more than a scintilla of evidence to support the finding, the legal-sufficiency challenge fails. *Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex.1998). The evidence is no more than a scintilla and, in legal effect, is no evidence "[w]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence." *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983). Suspicion linked to other suspicion produces only more suspicion, not some evidence. *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 727 (Tex.2003); *Browning–Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 928 (Tex.1993). Similarly, an inference stacked only on other inferences is not legally sufficient evidence. *Pitzner*, 106 S.W.3d at 727. Conversely, more than a scintilla exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex.1994).

When both legal and factual sufficiency challenges are raised on appeal, the court must first examine the legal sufficiency of the evidence. *See Glover v. Texas Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex.1981) (per curiam).

## B. Factual Sufficiency

When reviewing a jury verdict to determine the factual sufficiency of the evidence, the party attacking a finding on which an adverse party bore the burden of proof must show that the record presents "insufficient evidence" to support the finding. *Gooch*, 902 S.W.2d at 184. In a factual insufficiency attack on an adverse finding on which it bore the burden of proof at trial, a party must show that the finding is against the "great weight and preponderance of the evidence." *Raw Hide Oil & Gas*, 766 S.W.2d at 275. We examine and consider all the evidence. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex.1998). We set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986).

## IV. LEGAL SUFFICIENCY ANALYSIS

In its first issue, Western Steel argues it established the borrowed servant defense

as a matter of law. Specifically, Western Steel argues that it had the right to direct and control Altenburg's activities with respect to the cambering process and that it controlled all other aspects of Altenburg's work at all times while he was working on Western Steel's premises. Altenburg responds that the testimony relied upon by Western Steel to establish direction and control instead only reflects pre-work direction by Western Steel's employees. We must examine the record to determine whether some evidence exists to support the finding in issue, namely, that Altenburg was not a borrowed servant of Western Steel. *See Weirich v. Weirich*, 833 S.W.2d 942, 945 (Tex.1992).

### A. Borrowed Servant Defense

The supreme court has long recognized that a general or regular employee of one employer may become the borrowed employee of another with respect to some activities. *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 537 (Tex.2002); *J.A. Robinson & Sons, Inc. v. Wigart*, 431 S.W.2d 327, 330 (Tex.1968); *see also Wingfoot Enter. v. Alvarado*, 111 S.W.3d 134, 146 (Tex.2003); *Sparger v. Worley Hosp., Inc.*, 547 S.W.2d 582, 583 (Tex.1977). Whether an individual has become a borrowed employee of another hinges on whether the other employer or its agents have the right to direct and control the employee with respect to the details of the particular work at issue. *Wolff*, 94 S.W.3d at 537. If the general employee is placed under the control of a special employer in the course of performing a particular service, he becomes a borrowed employee of the special employer.[5] *Miller v. Hood*, 536 S.W.2d 278, 282 (Tex.Civ.App.-Corpus Christi 1976, writ ref'd n.r.e.). However, if the

employee remains under the control of his general employer while performing such service, he remains the employee of the general employer. *Id.*

If an employee of one employer becomes the borrowed employee of another, he is no longer considered an employee of the general employer for vicarious liability purposes. *Wolff*, 94 S.W.3d. at 538. The instruction in the Texas Pattern Jury Charge generally summarizes the principle:

> An employee ceases to be an employee of his general employer if he becomes the "borrowed employee" of another. One who would otherwise be in the general employment of one employer is a borrowed employee of another employer if such other employer or his agents have the right to direct and control the details of the particular work inquired about.

*Id.* (citing Texas Pattern Jury Charges—Malpractice, Premises Products, PJC 52.2 (1997)).

The borrowed servant doctrine is discussed in Restatement (Second) of Agency § 227 (1958), "Servant Lent to Another Master." *See Lara v. Lile*, 828 S.W.2d 536, 538 (Tex.App.-Corpus Christi 1992, writ denied). Section 227(b) states that:

> ... in the absence of evidence to the contrary, there is an inference that the actor remains in his general employment so long as, by the service rendered another, he is performing the business entrusted to him by the general employer. There is no inference that because the general employer has permitted a division of control, he has surrendered it.

---

5. In this opinion, the term "general employer" is used to refer to the provider of temporary workers that employs a worker ("general employee") who is then assigned to work for

a client of the provider, the "special employer." *See Wingfoot Enter. v. Alvarado*, 111 S.W.3d 134, 137 (Tex.2003).

*Lile*, 828 S.W.2d at 538. The question is which employer has the right of control over the actions of the employee. *Id.*

Examples of the type of control an employer normally exercises include when and where to begin and stop work, the regularity of hours, the amount of time spent on particular aspects of work, the tools and appliances used to perform the work, and the physical method or manner of accomplishing the end result. *See Thompson v. Travelers Indem. Co. of Rhode Island*, 789 S.W.2d 277, 278–79 (Tex.1990). The right of control is necessarily determined as an inference from facts and circumstances such as the following: (1) the nature of the general project; (2) the nature of the work to be performed by the machinery and employees furnished; (3) length of the special employment; (4) the type of machinery furnished; (5) acts representing an exercise of actual control; and (6) the right to substitute another operator of the machine, etc. *See Producers Chem. Co. v. McKay*, 366 S.W.2d 220, 226 (Tex.1963). We must carefully distinguish between authoritative direction and control, and mere suggestion as to details or necessary cooperation, where the work furnished is part of a larger undertaking. *See id.* Directions to a special employee that are limited to when to start and stop work, in coordination with the other employees' work on the ultimate project, do not constitute such control over the employee as to trigger the borrowed servant doctrine. *Id.* Applicability of the borrowed servant doctrine must be reviewed on a case-by-case basis. *See Lile*, 828 S.W.2d at 540; *Aguilar v. Wenglar Const. Co., Inc.*, 871 S.W.2d 829, 831 (Tex.App.-Corpus Christi 1994, no pet.).

The borrowed servant doctrine is an inferential rebuttal defense to tort liability based upon respondeat superior. *Linden–Alimak, Inc. v. McDonald*, 745 S.W.2d 82,

84 (Tex.App.-Fort Worth 1988, writ denied) (citing *Select Ins. Co. v. Boucher*, 561 S.W.2d 474, 477 (Tex.1978)). Western Steel bore the burden of proof on this question, *see Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 481 (Tex.2001), which was rejected by the jury. Western Steel therefore bears the burden to establish that Altenburg was its borrowed servant when he sustained an injury. *Dow Chem. Co.*, 46 S.W.3d at 241.

## B. Was There More Than a Scintilla of Evidence to Support the Jury's Finding?

In reviewing the record for evidence supporting the jury's finding, we turn to Altenburg's argument that the evidence establishes that Western Steel provided only pre-work direction, and the evidence was therefore insufficient to prove that Unique surrendered its right to control. Altenburg directs us to evidence that he contends shows (1) he was paid as an employee of Unique, (2) he brought his own required hand tools, safety equipment and gloves, (3) at the time of his injury he was providing welding services that did not require specific instruction, (4) he was not under the direct supervision of any Western Steel employee at the time of his injury, (5) the lack of safety equipment which caused the injury was Western Steel's safety equipment—the failure to utilize jack stands with stops, (6) the correction of this defect was made by Western Steel, not Unique, after his injury and because of his injury, (7) Unique, not Western Steel, paid for his workers' compensation benefits, and (8) there was no written contract which changed his employment status. I have examined the record for evidence that supports the jury's finding, while ignoring all evidence to the contrary. *See Lenz*, 79 S.W.3d at 19.

Altenburg asserts he took his own tools, safety equipment, and gloves. The record, including Altenburg's own testimony, establishes only that he provided his own steel-toed boots.

Altenburg points to evidence showing that he was not under the direct supervision of any Western Steel employee at the time of his injury. Altenburg testified that he was working on another project when a Western Steel supervisor told him he was needed on a "special project" and led him to the newly-assigned work area.

Altenburg asserts that, at the time of his injury, he was providing welding services that did not require specific instruction. He, argues that the input provided by Western Steel supervisors constituted "pre-work direction" rather than control over the details of the work he was performing. He testified that (1) he was not a welder, (2) prior to working at Western Steel, he had not cambered beams, and (3) a Western Steel supervisor trained him as to how to camber a beam on a machine prior to the additional training of cambering beams with the welding wand. Altenburg also testified that the Western Steel supervisor explained and demonstrated the cambering process, then had Altenburg start cambering. Altenburg testified that the supervisor remained there while Altenburg finished cambering the first beam to

review and ensure that Altenburg's technique was proper. The supervisor directed him on which beams to camber first and how to progress.

Altenburg also asserts that certain safety equipment was missing prior to the accident and that Western Steel made corrections to this "defect" after the accident. However, this evidence does not bear on whether Western Steel had or exercised the right to control Altenburg's work. *See Producers Chem.*, 366 S.W.2d at 226.

Ray Robles, Unique's industrial division manager, agreed that Unique did not contact Western Steel to advise or alter the manner in which Western Steel instructed Altenburg in cambering the beams. Further, Unique did not advise or instruct Western Steel to provide better and safer equipment and instructions.

Robles also testified that while Altenburg was Unique's paid employee, Western Steel paid Unique $6.00 an hour for work Altenburg performed for Western Steel. Michael Yankee, Western Steel's president, testified that the company paid an invoice to Unique and received, as the result, an income tax deduction "the same as paying a payroll check." None of this evidence establishes that Unique retained the right to control the nature or performance of the work. *See Wingfoot*, 111 S.W.3d at 143–44.[6]

---

6. The fact that workers' compensation coverage was provided by Unique does not alter our need to determine who retained the "right to control" Altenburg's work. *See Wingfoot Enter. v. Alvarado*, 111 S.W.3d 134, 144 n. 56 (Tex.2003) (citing *Rodriguez v. Martin Landscape Mgmt. Inc.*, 882 S.W.2d 602, 605–06 (Tex.App.-Houston [1st Dist.] 1994, no writ) and *Denison v. Haeber Roofing Co.*, 767 S.W.2d 862, 864–65 (Tex.App.-Corpus Christi 1989, no writ) (each holding that there was a fact question about whether the client company had a right to control employee and therefore whether it could assert exclusive remedy provision based on workers' compensation

policy obtained by general employer who supplied contract labor)); *see also Pederson v. Apple Corrugated Packaging, Inc.*, 874 S.W.2d 135, 137–38 (Tex.App.-Eastland 1994, writ denied) (holding the client company who controlled details of an employee's work at time of injury was an employer for purposes of the exclusive remedy bar, even though a leasing company carried the employee on its workers' compensation policy and the leasing company was the insured rather than the client). I note the analysis of the Texas Supreme Court:

These purposes of the [Workers' Compensation] Act are carried out by recognizing that the express definition of "employer" and

Altenburg also asserts that he was not a borrowed employee of Western Steel because Unique paid his workers' compensation benefits and that this factor supports the jury's finding. The record does not establish whether Unique is a "staff leasing services company" as defined and regulated by the Staff Leasing Services Act (the "SLSA"). *See* Tex. Lab.Code Ann. § 91.001–.063 (Vernon 1996 & Supp.2004–05). Generally, courts determine whether a workers' compensation insurance policy covers a worker's injury by determining whether the subscribing company is the worker's employer under the right-of-control test. *See Thompson,* 789 S.W.2d at 278. However, the SLSA expressly provides that a staff leasing company maintains "the right of direction and control" over leased employees for a variety of purposes, including workers' compensation benefits. *See* Tex. Lab.Code Ann. § 91.032 (Vernon Supp.2004–05). The SLSA grants the staff leasing company the exclusive right to elect or deny workers' compensation coverage to leased workers. *See id.,* § 91.042(b), (c) (Vernon 1996). Thus, the SLSA, where applicable, statutorily supersedes the common law right-of-control test in determining employer status of leased employees for workers' compensation coverage purposes only. *Tex. Workers' Comp. Ins. Fund v. Del Indus., Inc.,* 35 S.W.3d 591, 596 (Tex.2000).

Finally, Altenburg asserts that no written contract changed his employment status. Robles testified that Unique and Western Steel had a written contract, though it was not admitted in evidence. However, the Supreme Court has recently affirmed that contractual designation of control will not establish borrowed servant status as a matter of law where evidence shows that the parties acted to the contrary. *Wolff,* 94 S.W.3d at 544 n. 92. Considering the probative evidence and inferences, Altenburg's argument based on the contract must fail as a matter of law.

On this record, I am unable to conclude that there is legally insufficient evidence of probative force to sustain the jury's finding. *Pitzner,* 106 S.W.3d at 727; *Producer's Chem.,* 366 S.W.2d at 226.

## C. Does the evidence establish the opposite of the jury's finding?

Because Western Steel bore the burden of proof on the borrowed servant defense, we look to the circumstances surrounding Altenburg's temporary employment with Western Steel by reviewing the factors enumerated in *McKay,* 366 S.W.2d at 226. For this legal sufficiency analysis, I examine the record to determine if a proposition contrary to the jury's finding (*i.e.,* that Altenburg was a borrowed servant of Western Steel) is established as a matter of law. *Watts,* 629 S.W.2d at 696.

"employee" and the exclusive remedy provision may apply to more than one employer. An employee in Alvarado's situation will be working for her general employer (*i.e.,* the temporary staffing provider), but will also be subjected to laboring in the workplace and under the direction of the general employers' client company.... An employee injured while working under the direct supervision of a client company is conducting the business of both the general employer and that employer's client. The employee should be able to pursue workers' compensation benefits from either.... The

purposes underlying the Workers' Compensation Act and its definition of "employer" and "employee" indicate that the general employer is, and should be, an "employer" of a temporary worker even if a client company directs the details of that employee's work when the employee is injured.

*Wingfoot,* 111 S.W.3d at 142–43. *But see Garza v. Exel Logistics, Inc.,* 161 S.W.3d at 479–81 (Tex. 2005) (designated for publication) (finding that the issue of control over the individual's work is not the sole consideration in determining entitlement to the workers' compensation exclusive remedy bar).

### 1. The nature of the general project

Charles Johnson, a Western Steel shop foreman, testified that part of his job involved securing temporary workers. Altenburg had previously worked at Western Steel as a general helper, through Unique's competitor, and had used a welding torch. This particular project assigned to Altenburg involved cambering twenty or thirty beams and was part of a larger project, namely, building trusses which included cambered members. Altenburg had been working on one task and was directed to move to another aspect of the larger project which involved the cambering of the beams. Johnson testified that Altenburg would be working by himself and was expected to work until he finished the beams. Hedtke, another shop foreman, testified to these same facts. He also related that, after Altenburg was instructed on how and where to perform the work, Altenburg worked on one beam, under the direction of the supervisor, before beginning work on a second beam. Then, the incident which caused the injury occurred.

### 2. The nature of the work to be performed by the machinery and employees furnished

Johnson, Hedtke, and Alternburg each testified that Western Steel provided the welding equipment (the machinery), as well as the face shield, the welder's apron, and the protective gloves (the safety equipment) that Altenburg used in performing the work. Altenburg confirmed that Western Steel personnel supervised him and provided the employees who instructed and trained him on how to perform the work. Hedtke testified that he had instructed Altenburg on how to camber the beams and made sure he understood the procedure. Hedtke stated that he spent more than two hours with Altenburg, ex-plaining the entire process to him and showing him what needed to be done. He instructed Altenburg in the actual cambering process by demonstrating for at least thirty to forty-five minutes. This training included instruction on how to hold the welding wand, where to stand, when and where to begin, and how to camber the beams. Johnson similarly testified that on the date in question, Altenburg was in a "training process," but he was not given specific training on how to weld or use a welding torch. Hedtke supervised and directed Altenburg in his work, though he had stepped a short distance away at the time of the injury. Altenburg's engineering expert, Dr. Jack Madeley, testified that Altenburg was not being supervised at the time of his injury, but he agreed that Western Steel and its agents had the right to direct and control the details of the cambering process.

### 3. Length of the special employment

Johnson and Hedtke each testified that cambering twenty to thirty beams would take two to three days. Altenburg testified that, when he first began working at Western Steel, he was grinding corners off metal pieces. He subsequently worked there as a pipe fitter before receiving the assignment to camber beams. The actual length of the prior special employment at Western Steel was approximately two months. The length of the actual work involving cambering beams was approximately two hours, though the anticipated length of that particular assignment was three days.

### 4. The type of machinery furnished

Testimony of several witnesses reflected that Western Steel provided the welding tools and equipment to camber the beams, including the torch, gas striker, and winch. Western Steel provided the materials, in-

cluding the beams, four-by-four blocks, and welding materials. Western Steel also provided safety equipment, including the face shield, welder's apron, and protective gloves.

### 5. Acts representing an exercise of actual control

Altenburg testified that a supervisor at Western Steel told him he was needed in a "special detail" and took him to the location where steel beams were lined in a row, ready to be cambered. He testified that he had no prior training on how to camber a beam on the floor, but he had been trained to camber a beam on a machine. The supervisor demonstrated the cambering process on the first beam and then handed Altenburg the welding torch to finish it. Altenburg began cambering that beam, with the supervisor watching to ensure his technique was good because, as Altenburg testified, "it's a little tricky." Altenburg further testified that, after he completed the first beam, the supervisor said, "Just go ahead and, you know, you're on your own.... I'll come by and check you every now and then, to make sure everything's all right." Altenburg testified that the supervisor directed him to start on the beams lined up in the back and to move from back to front, instead of from front to back. He explained, "So, instead of being postured like that, I'd be slumped over quite a bit, trying to make an effort to reach that last beam.... It was a little awkward." Altenburg testified that the beam he cambered by himself was the one that tipped over and landed on his foot. Hedtke testified that shortly after he walked away from Altenburg, he heard the beam fall, and he returned to the scene where he saw Altenburg holding his foot.

Altenburg's testimony further addressed the control issue. He agreed that Western Steel told him what time to appear and where to go, and that Western Steel controlled and directed (1) when he was to be at work each day, (2) when he could take breaks, (3) his quitting time, (4) the number of hours he could work, (5) his activities while he was a temporary worker on the premises, and (6) how and in what manner and sequence to perform the cambering process on the beams. He further confirmed Western Steel first instructed and then supervised him in the cambering process, directed and controlled his performance of that process, and provided the tools, welding equipment, and safety equipment to be used in that process. He testified that Western Steel could modify the work he performed and had the right to terminate his employment.

Johnson testified that Western Steel used temporary employees because, "It's a good way to find qualified help in a shop. And ... we just need temporary help because of the different types of jobs that come around." Although he had the opportunity to hire Altenburg as "a full-time employee," he did not hire him as one; rather, Johnson referred Altenburg to Unique "to get them to hire him and send him to Western Steel." Johnson testified that no one from Unique attempted to direct and control the activities of the temporaries or the cambering process, and this control at all times remained the exclusive right of Western Steel. He further testified that Western Steel supervisors had the right to direct and control the details of the work of the temporary employees.

Robles testified that his duties with Unique were to oversee the placement coordinators who interviewed all employees sent to clients. Unique worked to match the skills of its client employees to the needs of its client companies. He agreed Unique loaned its temporary employees to companies like Western Steel to

perform work for those companies. Robles testified that Altenburg was employed with Unique during the last quarter of 1998, Western Steel was Unique's client in September 1998, and Unique sent Altenburg to Western Steel.

Robles further testified that the client company, Western Steel, had the right to direct and control the details of the activities performed by Unique's "client employees" such as Altenburg. He testified that Unique had no right to and never attempted to go onto Western Steel's property and control or direct the work that Altenburg was performing. Unique had no right to tell Altenburg when to report for work at Western Steel, when to take his breaks, how long he would work for Western Steel, or the days he would work. Unique did not provide any of the tools, equipment, or materials utilized by Altenburg on the job. Robles further testified that Western Steel had the right to direct and control not only Altenburg's work, but also the work of all other employees Unique sent to Western Steel. Unique relied upon its client companies such as Western Steel to supervise any Unique employees working at their job site. He specifically testified that "it was an understanding that the client company, being Western Steel, would direct Mr.—or any of our employees out there as to what their work would be and what time they would show up and what hours they would work." Robles further testified that Unique

> ... had no—no—no control over that. I mean, as far as controlling his activities, that was left entirely up to the supervisor since he was the one that knew how the job needed to be done and what needed to be done. So it was the super-

visor's responsibility to let Mr. Altenburg know exactly what needed to be done, where he needed to be placed and everything.[7]

The supervisors referenced were "Western Steel supervisors."

Unique and Western Steel had a contract between them which governed their relationship.[8] Robles testified that "Western Steel in fact, paid Unique to have Mr. Altenburg work over there, and out of that pay, they made—there were payments made for his salary to Mr. Altenburg."

Madeley, Altenburg's engineering expert, also testified that Western Steel and its agents had the right to direct and control the details of the cambering process. Altenburg, when asked whether he considered himself a Western Steel employee, answered: "I knew that I was sent there by Unique Temporary Services. They were my paid employer." However, he further testified, as noted above, that all aspects of the work were directed and controlled by Western Steel.

The accident occurred after Altenburg was instructed in the cambering process and worked alone for a short time. The supervisor left but was to check on Altenburg "now and then, to make sure everything's all right." Altenburg testified that he would have followed any instruction, direction and control given to him by the Western Steel supervisor because "during the time that [he] was injured, he [the supervisor] had the right to direct and control [Altenburg's] work."

The evidence establishes that Western Steel maintained the right to direct and

---

7. On cross-examination, Robles admitted he had no personal knowledge of facts to show that Altenburg, at the time of his injury, was under the specific control of any supervisor or person from Western Steel.

8. As previously noted, the contract between Western Steel and Unique was not part of the evidence below.

control the details of the particular work, namely, the cambering process.

## V. FACTUAL SUFFICIENCY ANALYSIS

Determining whether the evidence at trial was factually insufficient to support the jury's finding, such that the finding is against the great weight and preponderance of the evidence as to be manifestly unjust, similarly requires a review of the entire record. *Pool v. Ford Motor Co.*, 715 S.W.2d at 635. The same facts reviewed to determine whether or not Western Steel's borrowed servant defense was established as a matter of law have been reviewed to determine whether the evidence was factually sufficient to support the jury's finding that Altenburg was not a borrowed servant. *Id.*

Evidence shows that Western Steel had the right to direct and control the details of Altenburg's work, Unique did not control the work performed, and Unique did not go out to direct the activities while Altenburg was at Western Steel. Further, Unique (1) did not and had no right to tell Altenburg when to report to work, (2) had no right to direct or control the length of Altenburg's employment or the days he would work, (3) did not provide the tools or equipment, including safety equipment, that Altenburg used, (4) did not instruct, train, or supervise Altenburg in the task at hand, and (5) did not direct Altenburg as to when, where, or how to perform the work. The evidence establishes that Western Steel had the right to direct and control Altenburg's work at all times, and Unique relied on Western Steel's supervisors to direct and control all aspects of the work.

Rather than a mere suggestion as to details or necessary cooperation, Western Steel provided "exactly the type of direction and control contemplated by the doctrine of borrowed servant." *Wenglar*, 871 S.W.2d at 832 (finding that basic guidance in how to complete a specific task, including where to stand and how to physically accomplish the work, supported a finding that the employee was a borrowed servant); *see also Exxon Corp. v. Perez*, 842 S.W.2d 629, 630 n. 2 (Tex.1992) (per curiam). I conclude that Western Steel had the right to, and did, direct and control the details of Altenburg's work in the manner contemplated by the borrowed servant doctrine, thus placing Altenburg temporarily under the "employ" of Western Steel for purposes of its responsibility for his conduct and for his safety in performing the work.

However, the Texas Supreme Court in *Garza v. Exel Logistics, Inc.*, 161 S.W.3d 473, 479–81 (Tex. 2005) (designated for publication) recently held that the determination of control over the individual's work is not itself dispositive of the issue of whether a special employer is entitled to assert the exclusive remedy bar under the workers' compensation statute.

## VII. DISPOSITION

In summary, after conducting the analysis applying the factors in *McKay*, I conclude that not more than a scintilla of evidence existed to support the jury's finding on the borrowed servant issue, an issue on which Western Steel bore the burden of proof. Under the second prong of the legal sufficiency analysis, review of the entire record was required to determine whether the opposite of the jury's finding was established as a matter of law. Similarly the factual sufficiency analysis required review of the entire record to determine if the jury's finding was so against the great weight and preponderance of the evidence as to be manifestly unjust.

Respectfully, I would sustain Western Steel's first issue on appeal, that the evi-

dence was legally insufficient to support the jury's finding, and that the evidence as to borrowed servant, a defense on which Western Steel bore the burden of proof, conclusively established the opposite of the jury's finding. I conclude the evidence established that Altenburg was a borrowed employee of Western Steel as a matter of law. I would similarly sustain Western Steel's second issue on appeal, that the evidence was factually insufficient to support the jury's finding, because that finding was against the great weight and preponderance of the evidence.

We normally reverse and render when we sustain a legal sufficiency issue on appeal. *Vista Chevrolet, Inc. v. Lewis,* 709 S.W.2d 176, 177 (Tex.1986) (per curiam). However, because the parties did not have the benefit of the recent Texas Supreme Court decision in *Garza,* I would remand to the trial court for further proceedings consistent with that opinion. *Garza,* 161 S.W.3d at 479–81.

### VIII. CONCLUSION

The issue on appeal focuses on the jury's answer to question 5, whether Altenburg was a borrowed servant. I would sustain Western Steel's first issue on appeal on the sole question before us of borrowed servant. I would reverse. In light of *Garza,* I would remand for further consideration by the trial court as to whether or not Western Steel, even if Alternburg were its borrowed servant, adequately tendered evidence entitling it to claim protection under the workers' compensation exclusive remedy bar. Tex.R.App. P. 43.2 and 43.3(a).

